# JOHN RAMSEY, JR. EL AL. *v.* PHYSICIAN'S MEMORIAL HOSPITAL, INC. ET AL.

[No. 559, September Term, 1976.]

*Decided May 12, 1977.*

The cause was argued before MORTON, MENCHINE and MASON, JJ.

*Henry E. Weil*, with whom were *Belli, Weil & Jacobs* on the brief, for appellants.

*M. Wayne Munday*, with whom were *James C. Tucker* and *Mudd, Mudd, Munday & Heinze* on the brief, for appellees.

MORTON, J., delivered the opinion of the Court.

Appellants, parents of infant children Ernest Lee Ramsey (deceased) and Kenneth W. Ramsey, brought suit in the Circuit Court for Prince George's County against Physician's Memorial Hospital, Inc., A. Del LaPaz, M.D., S. Azer, M.D., and Om P. Chhabra, M.D., charging that although the defendants had held themselves out to be qualified and competent to render medical treatment, they negligently failed to diagnose the disease of Rocky Mountain Spotted Fever which the infant children were suffering and from which disease Ernest Lee Ramsey, age one year, died and Kenneth W. Ramsey, age two years, became seriously ill. The case was subsequently removed to the Circuit Court for Calvert County where it was tried before a jury (Bowen, J., presiding).

At the close of the presentation of evidence, the court reserved defendants' motions for directed verdicts in accordance with Maryland Rule 552 (c) and allowed the case to go to the jury. The jury returned a verdict for appellants against Physician's Memorial Hospital, Inc., and Dr. Azer, appellees herein, and in favor of Dr. Del LaPaz and Dr. Chhabra. Damages were assessed at $75,280 for Ernest and $5,000 for Kenneth. Thereafter, pursuant to Maryland Rule 563 (a) (2), the court entered judgments n.o.v. in favor of the hospital and Dr. Azer.

The single issue on appeal is whether the trial judge erred in entering the judgments. The verdicts rendered in favor of Dr. Del LaPaz and Dr. Chhabra are not challenged.

According to the evidence, the Ramseys lived in a rural area of Charles County known as Gallant Green. In early May, 1974, Mrs. Ramsey removed two ticks from her son Kenneth. Several days later she noticed a rash on both Ernest and Kenneth. The rash started on the chest and head and was accompanied by a high fever. This prompted Mr. and Mrs. Ramsey to take their two boys to the emergency room at Physician's Memorial Hospital. While there, Mrs. Ramsey told the nurse on duty that she had removed two ticks from Kenneth, one from his head and one from his stomach. This testimony was confirmed by Mr. Ramsey and not contradicted by other witnesses. According to the attending physician, Dr. Del LaPaz, he asked the parents about ticks and was told nothing. He also ordered a search for ticks which proved fruitless. The nurse did not tell Dr. Del LaPaz of the tick history which Mrs. Ramsey had related to her.

In diagnosing their condition, Dr. Del LaPaz decided the children were suffering from measles and prescribed that the boys take aspirin and be kept in a darkened room. Two days later the rash had spread to the arms and legs of the two boys and the fever had not subsided. On that day, May 14, 1974, the Ramseys returned to the emergency room at Physician's Memorial Hospital where the children were examined by Dr. Azer.

Dr. Azer, not a pediatrician himself, was unsure of his tentative diagnosis of measles and consulted with the Ramsey's pediatrician, Dr. Chhabra. Thereafter, Dr. Azer instructed the Ramseys to see Dr. Chhabra and not to come back to the emergency room as there was nothing else that could be done there. Dr. Chhabra examined the boys the following day while they were still suffering from a generalized rash and high fever. Again measles was tentatively diagnosed. Dr. Chhabra advised that the boys be kept in a dark room and that he be notified of any change.

Four days later the children's condition had greatly worsened, but the Ramseys were unable to reach Dr. Chhabra. On the following day Ernest was found dead.

Kenneth was taken to Cafritz Hospital where two ticks were removed from him. He was subsequently treated and cured of Rocky Mountain Spotted Fever. The only injury he sustained was a limp which was gone within six months. The autopsy performed on Ernest showed that he died of Rocky Mountain Spotted Fever.

In a definitive opinion refashioning the standards of care by which the conduct of a physician or a hospital is to be appraised in medical malpractice cases, Judge Irving A. Levine announced for the Court of Appeals in *Shilkret v. Annapolis Emergency Hosp.*, 276 Md. 187 (1975):

> " [A] physician is under a duty to use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which he belongs, acting in the same or similar circumstances. Under this standard, advances in the profession, availability of facilities, specialization or general practice, proximity of specialists and special facilities, together with all other relevant considerations, are to be taken into account." *Id.* at 200-01.

> " [A] hospital is required to use that degree of care and skill which is expected of a reasonably competent hospital in the same or similar circumstances. As in cases brought against physicians, advances in the profession, availability of special facilities and specialists, together with all other relevant considerations, are to be taken into account." *Id.* at 202.

## I. Dr. Azer

According to the medical evidence Rocky Mountain Spotted Fever is a relatively rare disease caused by the bite of an infected tick. In 1970 there were 270 cases in the United States of which approximately ten percent occurred in Maryland. It is a difficult disease to detect since there are several differential diagnoses which must be considered because certain symptoms are common to a number of

various diseases. These differential diagnoses usually include Rocky Mountain Spotted Fever, measles, endemic typhus, meningococcemia, typhoid fever, early smallpox and certain intra viral infections with rash.

In the case of the Ramsey boys, the diagnosis, according to the testimony, was particularly difficult. None of the doctors had any knowledge of the tick history given to the nurse in the emergency room on May 12, 1974. The rash began as it would in measles, on the head and chest, spreading peripherally toward the extremities; whereas, the rash typical of Rocky Mountain Spotted Fever ordinarily begins on the hands and feet and spreads toward the center of the body. The rash was reddish in color and could only be distinguished from measles when it turned purple. The high fever is characteristic of both measles and Rocky Mountain Spotted Fever. To complicate the diagnoses further, neither boy had been vaccinated against measles. Since measles is a contagious disease, it would be common to find two brothers exhibiting symptoms of measles at the same time. Rocky Mountain Spotted Fever, on the other hand, is not contagious and simultaneous infection is very unusual. These factors led each of the three doctors who saw Ernest and Kenneth to diagnose the illness as measles or something related thereto. Appellants argue that once several diagnoses were considered, it was a violation of the acceptable standard of medical practice not to have hospitalized the children for observation and, assuming further manifestation of Rocky Mountain Spotted Fever, eventually treatment.

Appellants endeavored to establish this standard through the following testimony of their expert witness, Dr. Walter E. Goozh, M.D.:

"JUDGE BOWEN: Why don't you ask it this way. You are a pediatrician, you are practicing in Charles County. Two people are brought to you of the ages of these children, one of which you have received a call from the hospital about before. They displayed the fever as described in the question, 104

or 105 degrees rectally. They had a generalized rash consistent with a measles rash. There is no history of any rash commenced on their hands or feet or at their wrists. There is no history of tick bite. You consider this problem. What do you think meets the minimum standard of care at that point?

\* \* \*

"THE WITNESS: What I would do is with a patient with this type of problem is what we did with the last patient of this sort. The patient was hospitalized with the diagnosis of fever of undetermined origin and testing was done to eliminate the possibility of Rocky Mountain Spotted Fever along with other diagnosis. It was not started on treatment immediately. It was determined he did not have Rocky Mountain Spotted Fever and was not treated for it.

BY MR. WEIL [Appellants' attorney]:

Q. Dr. Goozh, the patient, assuming this is a hypothetical question, had presented himself to a physician in Charles County, Maryland, on May 15, 1974 with high fever with generalized macular papular rash on the body, predominant on the face and the back of the ears but also on the arms and on the legs but no history of tick bite with this particular physician, do you have an opinion based on reasonable medical certainty as to whether or not it was in violation of the minimum standard of care to which the patient was entitled not to admit him in the hospital for observation?

\* \* \*

"THE WITNESS: I would say it would be very difficult to have a definite opinion to really give a yes or no opinion. I have feelings about it but I didn't see the patient. It is very difficult to know. I

could go on and say that a patient who is now being febrile for three or four days has been seen — is now being seen for the third time by a physician in this period is still quite sick, at least appears to be from the information I have been given, I think serious consideration should be given to hospitalization. I personally would probably hospitalize such a patient.

MR. EHRMANTRAUT [Appellees' attorney]: We are not dealing with what Dr. Goozh may personally do under the standard of care and I would move that the last part of his answer be stricken.

JUDGE BOWEN: I think he has explained his answer to the Jury. The difference of what he would do and what is required to be done to meet the minimum standard of care is two different things."

In determining whether the trial judge properly entered the judgment n.o.v., we turn to *Miller v. Michalek*, 13 Md. App. 16, 17-18 (1971), where this Court articulated the standards by which a trial court is bound when considering a motion for judgment n.o.v.:

"The trial court is governed by the same considerations in determining a motion for a directed verdict as it is in determining a motion for judgment n.o.v. It 'must assume the truth of all credible evidence on that issue and of all inferences fairly deducible therefrom, and consider them in the light most favorable to the party against whom the motion is made * * *.' 'If there is any competent evidence, however slight, leading to support the plaintiff's right to recover, the case should be submitted to the jury,' and a motion for judgment n.o.v. denied." (Citations omitted.)

*See also Fleming v. Prince George's County*, 277 Md. 655, 658 (1976).

Upon a careful analysis of Dr. Goozh's testimony, we concur with the trial court's conclusion that Dr. Goozh, while stating that he personally would have hospitalized the children in the present situation, did not assert that the failure to hospitalize was violative of the minimal standard of care to which appellants' children were entitled. When he was asked the question:

> "[D]o you have an opinion based on reasonable medical certainty as to whether or not it was in violation of the minimum standard of care to which the patient was entitled not to admit him in the hospital for observation?,"

he replied:

> "I would say it would be very difficult to have a definite opinion to really give a yes or no opinion."

Thus, appellants failed to produce medical evidence from which the jury could find that Dr. Azer violated his duty "to use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which he belongs, acting in the same or similar circumstances." We find no error in the trial judge's granting Dr. Azer's motion for judgment n.o.v.

## II. Physician's Memorial Hospital, Inc.

On the other hand, our perusal of the record compels us to the conclusion that the trial judge erred in granting the judgment n.o.v. with regard to the hospital. There was testimony from both Mr. and Mrs. Ramsey that the nurse on duty in the emergency room at the time the children were first taken to the hospital was told that two ticks had been removed from Kenneth. This testimony was uncontradicted. There was also evidence that the nurse failed to relate this information to Dr. Del LaPaz, the attending emergency room physician.

Dr. Goozh, appellants' medical expert, was asked the following question:

"Through your familiarity with that custom and usage, do you have an opinion based upon reasonable medical certainty as to whether or not assuming that the parent notified the nurse that she had removed two ticks from one of the boys several days earlier and that this information was not communicated to the attending physician, whether that failure to communicate by the nurse to the doctor was in violation of the minimum standard of care to which this patient was entitled? "

The doctor replied:

"My opinion is that it is incumbent upon an emergency room staff, be it nurse or even recording secretaries signing the patient in to record significant medical data. I feel that the knowledge by a nurse that ticks were removed from a patient in the spring, in the season, and that season of the year represents significant data. If this were not passed on I would consider that a failure to apply an adequate level of conformance as to standards, yes."

Thus, there was ample evidence that the failure of the nurse to communicate this element of the patients' history to the attending physician was a serious violation of her duties as a nurse. That she was an agent or employee of the hospital is conceded and it is, of course, well settled that a hospital, under the doctrine of *respondeat superior*, is liable for the negligent conduct of its nurses when committed within the scope of their employment. *Fleming v. Prince George's County, supra; Thomas v. Corso*, 265 Md. 84 (1972). *See generally, Rusnack v. Giant Food, Inc.*, 26 Md. App. 250, 261-65 (1975).

There was further evidence that the failure of the nurse to relate the information to the attending physician was a

contributing proximate cause to the death of Ernest Lee Ramsey and the serious illness of Kenneth W. Ramsey.

It is at once apparent that the jury could have found from the evidence before it that the hospital, as a result of the negligent conduct of the emergency room nurse, did not "use that degree of care and skill which is expected of a reasonably competent hospital in the same or similar circumstances" and that the failure to provide the proper degree of care and skill resulted in the damages sustained by appellants. By entering the judgment n.o.v., the trial judge improperly invaded the province of the jury. Accordingly, the judgment n.o.v. is hereby vacated and the verdict of the jury against the Physician's Memorial Hospital, Inc., and in favor of appellants is reinstated.

> *Judgments affirmed as to Dr. Azer; judgments n.o.v. vacated as to Physician's Memorial Hospital, Inc., and judgments entered in favor of appellants on the verdicts; costs to be divided between appellants and Physician's Memorial Hospital, Inc.*