739 A.2d 875

SUBURBAN HOSPITAL, INC., et al.

v.

Phyllis R. KIRSON.

No. 1629, Sept. Term, 1998.

Court of Special Appeals of Maryland.

Oct. 27, 1999.

534

Michael I. Joseph (Godard, West & Adelman, on the brief, Suburban and Smith), Rockville, for appellants.

H. Kenneth Armstrong (Armstrong, Donohue, Ceppos & Vaughn, on the brief, Aparangi), Rockville, for appellants.

John F.X. Costello (McCarthy, Bacon and Costello, LLP, on the brief), Lanham, for appellee.

Argued before MOYLAN, HOLLANDER and SALMON, JJ.

MOYLAN, Judge.

Suburban Hospital, Inc., Mary Beth Smith, and Aparangi Paul, the appellants/cross-appellees, challenge a judgment in the Circuit Court for Montgomery County, Judge Nelson W. Rupp, Jr. presiding, whereby a jury awarded Phyllis R. Kirson, the appellee/cross-appellant, $130,500 in her medical malpractice suit. The issues raised on appeal are:

1) Did the trial court err in denying Suburban Hospital's and Smith's Motions for Judgment Notwithstanding the Verdict based on the exclusivity provision of the Workers' Compensation Act?

2) Did the trial court err in denying Smith's Motion for Judgment Notwithstanding the Verdict because there was insufficient evidence as a matter of law to establish Smith's negligence?

3) Did the trial court err in refusing the appellants' request to admit testimonial and documentary evidence of prior payments made by Suburban Hospital to or on behalf of Kirson and in consequently failing to reduce the verdict to reflect those previous payments?

4) Did the trial court err in permitting certain cross-examination of Susan Howell, R.N., one of the appellants' expert witnesses?

5) Did the trial court err in permitting the ostensibly leading questioning of Kirson's expert witness Dr. Antoni Goral?

Kirson, as cross-appellant, raises the following issues:

6) Did the trial court err in permitting the ostensibly irrelevant testimony of Dr. Clifford Hinkes, an expert for the defense?

7) Did the trial court err in granting Anderson's Motion for Judgment Notwithstanding the Verdict?

8) Should this Court dismiss the appellants' appeals?

## FACTUAL AND PROCEDURAL BACKGROUND

On August 6, 1993, Phyllis R. Kirson ("Kirson"), a sixty-year-old nurse at Suburban Hospital, fell in the operating room during the course of her employment. As a result of the fall, Kirson suffered a fractured right femur just above a right total knee prosthesis [1] and was admitted as a patient to Suburban Hospital. On August 7, Kirson underwent surgery at Suburban Hospital to repair the fractured femur. Six days later on August 13, Kirson, while still a patient, fell in her hospital room while being assisted in the use of a bedside toilet.

At the time of the August 13 fall, Mary Beth Smith ("Smith") was the nurse assigned to Kirson, Mary Anderson ("Anderson") was the charge nurse on duty, Aparangi Paul ("Paul") was a patient care technician, and Carol Stephens ("Stephens") was the patient care manager of the orthopaedic unit. As a result of the fall, an internal fixation device that had been placed in Kirson's leg during the August 7 surgery came loose. Kirson was therefore required to undergo a revisionary surgical procedure on August 23, 1993, during which time Dr. Antoni Goral, an orthopaedic surgeon, inserted a new plate along with three new screws in Kirson's leg.

The parties disputed the circumstances surrounding Kirson's fall in her hospital room on August 13. According to Kirson, she, while in her room, notified hospital personnel by pushing a call light that she needed assistance. Paul and an unnamed nurse responded. Kirson was assisted out of bed and to a bedside toilet. Paul and the nurse left the room so

---

1. Kirson had received the right knee prosthesis in 1991.

Kirson could use the toilet. Kirson once again pushed the call light and Paul alone responded. Paul assisted Kirson to a standing position. Once she was standing, Kirson complained of feeling light-headed and dizzy. Paul accordingly instructed Kirson to sit back down, which she did. Paul then got a walker, again assisted Kirson to a standing position, removed the toilet from the bedside, and left the room. Kirson was left standing alone with the walker when she fell.

Paul, on the other hand, testified that she alone responded to Kirson's first call for assistance. Paul helped Kirson out of bed without incident and she stayed with Kirson while Kirson used the toilet. Paul then assisted Kirson to a standing position and to a walker, at which time Kirson complained of feeling light-headed and dizzy. Paul instructed Kirson to sit down, which Kirson did. Paul pushed the call light to request additional assistance. It was while waiting for assistance that Kirson stood back up and fell.

Kirson subsequently filed suit in the Circuit Court for Montgomery County, charging 1) Suburban Hospital, 2) Paul, 3) Smith, 4) Anderson, and 5) Stephens with negligence. In that lawsuit, Kirson alleged that she developed hardware bursitis as a direct result of the revisionary surgical procedure performed following her August 13 fall. As a result of the hardware bursitis, Kirson had to have some of the pins in her right leg removed in March of 1994. As a result of the March 1994 procedure, Kirson developed an infection in her knee prosthesis. The following September, her knee prosthesis was removed and a new one was inserted in October.[2] At trial, it was contested whether Kirson's bursitis and subsequent knee prosthesis replacement were a direct result of the August 13 fall or whether the bursitis would have developed regardless of the August 13 fall.

The case was tried before a jury beginning on June 8, 1998. All of the defendants moved for judgment at the close of

---

2. Dr. Goral was Kirson's treating physician and performed all of the above-mentioned procedures.

Kirson's case and again at the close of all of the evidence. Paul's motion was denied. The court reserved its decision on the other defendants' motions for judgment and submitted the case to the jury. On June 12, 1998, the following verdicts were returned:

1) The jury found in favor of Kirson and against Paul, Smith, and Anderson;

2) The jury found against Kirson and in favor of Stephens; [3]

3) The jury found against Kirson and in favor of Suburban Hospital on the issue of independent negligence; and

4) Judgment was entered against Suburban Hospital for being vicariously liable for the actions of its employees—Paul, Smith, and Anderson.

The jury awarded Kirson a total of $130,500—$27,500 for past medical expenses, $28,000 for past loss of earnings, $75,000 for noneconomic damages, and $0 for loss of future earnings.

On June 22, 1998, Suburban Hospital, Smith, and Anderson filed a Motion for Judgment Notwithstanding the Verdict ("JNOV") as well as a Motion for Remittitur. On August 13, the court granted the Motion for JNOV as to Anderson only and denied all other requested relief. This appeal and cross-appeal were subsequently noted.

## THE MOTION TO DISMISS THE APPEALS

Before reaching any of the substantive issues before us, we address preliminarily the last contention raised by Kirson in her cross-appeal—1) that Paul's appeal should be dismissed because she "did not raise any issue contained in the [appellants'] brief," and 2) that Suburban Hospital's and Smith's appeal should be dismissed for failure to file a proper record extract. Neither contention warrants a dismissal.

■ As to the dismissal of Paul's appeal, we note that on the cover page of the joint appellate brief Paul is listed as an

---

3. Stephens is, consequently, not a party to this appeal.

appellant and H. Kenneth Armstrong is listed as her counsel. Merely because Paul has chosen to adopt the arguments made by Suburban Hospital and Smith and not to raise any additional issues unique only to her does not mean, as Kirson contends, that Paul has "failed to file a brief . . . in violation of [Maryland Rules] 8–502(a)(1), 8–502(b), and 8–502(d)." None of the provisions of the rule cited by Kirson applies. All three of the aforementioned subsections deal with the filing of an appellate brief: subsection (a) is entitled "Duty to file; time;" subsection (b) is entitled "Extension of time;" and subsection (d) is entitled "Default." What Kirson overlooks is subsection (a)(7) of Rule 8–502, which provides:

> **Multiple** appellants or appellees. *In an appeal involving more than one appellant* or appellee, including actions consolidated for purposes of the appeal, *any number of appellants* or appellees *may join in a single brief.*

(Emphasis supplied). Thus, Paul *did* file a brief in a timely manner in conformity with Rule 8–502(a)(7).

Kirson also contends that this Court should dismiss the appeal of Suburban Hospital and Smith because they have failed to include within their record extract (1) transcripts of the hearings on the motions for summary judgement, (2) "material portions" of the testimony of Susan Howell, and (3) any portions of their motions for summary judgment or Kirson's opposition to their motions for summary judgment. Kirson claims that "[w]hile dismissal of the appeal is not normally appropriate, it may be in this matter."

All of the omissions by the appellants complained of by Kirson, however, were cured by Kirson's Appendix to her brief. Any potential gap in the record caused by the failure of the appellants to include certain pertinent information within the record extract was, therefore, rectified by the inclusion of those materials in Kirson's Appendix. Rule 8–501(m) provides that "[o]rdinarily, an appeal will not be dismissed for failure to file a record extract in compliance with this rule." Because we have been supplied with all of the information necessary to decide the issues before us on appeal, dismissal is not warrant-

ed. *See Thanos v. Mitchell,* 220 Md. 389, 393, 152 A.2d 833 (1959) (Motion to dismiss appeal denied where "the appellee in his appendix furnished the material which he claims should have been printed by the appellant."); *Burdette v. LaScola,* 40 Md.App. 720, 736, 395 A.2d 169 (1978) ("While the appellants' record extract is deficient, that deficiency has been corrected by the appellees' printing of an appendix in which the material missing from the appellants' extract is supplied. We, therefore, deny the motion to dismiss.") (citation omitted).

## THE EXCLUSIVITY PROVISION OF THE WORKERS' COMPENSATION ACT

The appellants have framed the primary issue in this case in three-pronged terms:

The circuit court erred in denying Suburban Hospital's and Mary Beth Smith's motion for summary judgment, motions for judgment and motion for judgment notwithstanding the verdict, all of which were premised upon the exclusivity provision of the Workers' Compensation Act.

The second and third sub-issues, to wit, whether the trial court erred in denying 1) the motions for judgment and 2) the motions for JNOV, are identical for purposes of our analysis. *See* Maryland Rule 2–532; *Houston v. Safeway Stores, Inc.,* 109 Md.App. 177, 182–83, 674 A.2d 87 (1996), *rev'd on other grounds,* 346 Md. 503, 697 A.2d 851 (1997) (Motion for JNOV reviewed under the same legal standards as motion for judgment made at close of all of the evidence.) The first sub-issue raised, to wit, whether the trial court erred in denying the motion for summary judgment, is moot. To simplify matters, therefore, we reframe the appellants' issue as simply whether the trial court erred in denying their Motion for JNOV.

The trial court, when considering a motion for JNOV, is bound by the following standards:

It must assume the truth of all credible evidence on that issue and of all inferences fairly deducible therefrom, and consider them in the light most favorable to the party against whom the motion is made.... If there is any

competent evidence, however slight, leading to support the plaintiff's right to recover, the case should be submitted to the jury, and a motion for judgment n.o.v. denied.

*Ramsey v. Physicians Memorial Hosp., Inc.*, 36 Md.App. 42, 48, 373 A.2d 26 (1977) (internal quotations omitted) (quoting *Miller v. Michalek*, 13 Md.App. 16, 17–18, 281 A.2d 117 (1971)); *Houston v. Safeway Stores, Inc.*, 109 Md.App. 177, 182–83, 674 A.2d 87 (1996), *rev'd on other grounds*, 346 Md. 503, 697 A.2d 851 (1997).

█ The appellants base their argument on Title 9 of the Labor and Employment Article, which deals with Workers' Compensation. They rely particularly on § 9–509, which provides:

(a) *Employers.*—Except as otherwise provided in this title, the liability of an employer under this title is exclusive.

(b) *Covered employees and dependents.*—Except as otherwise provided in this title, *the compensation provided under this title to a covered employee* or the dependents of a covered employee *is in place of any right of action against any person.*

(Emphasis supplied).

Citing a plethora of case law dealing with § 9–509(b), Suburban Hospital[4] claims that it was immune from the present suit because Kirson had already received Workers' Compensation for her injuries and the Workers' Compensation award is the exclusive remedy permitted.[5] Suburban Hospital's claim

---

4. Because Smith's alleged entitlement to an immunity from suit based on exclusivity is derivative from her employer's, Suburban Hospital's, claim in that regard, we will, simply as a linguistic convenience, use Suburban Hospital in the singular in our further discussion of this contention.

5. Kirson claims that this issue has not been preserved because immunity under the Workers' Compensation Act is an affirmative defense which must be raised in the appellants' answer, which it was not. Maryland Rule 2–323(g) lists twenty-one separate affirmative defenses which must be pleaded in an answer. The immunity at issue is not one of those specifically enumerated affirmative defenses within subsection (g). Thus, while the appellants would have been permitted to have

is that Kirson, its employee, suffered an "accidental personal injury" on August 6 for which she received workers' compensation and that, under the exclusivity provision of § 9–509(a), she was thereby barred from bringing any other action against it. Section 9–101(b) defines "accidental personal injury":

"Accidental personal injury" means:

(1) an accidental injury that *arises out of and in the course of employment;*

(2) an injury caused by a willful or negligent act of a third person directed against a covered employee *in the course of the employment of the covered employee;* or

(3) a disease or infection that naturally results from an accidental injury *that arises out of and in the course of employment* [.]

(Emphasis supplied).

Suburban Hospital's exclusivity argument is in the proverbial right pew in the wrong church. The argument would have unassailable validity in the context of August 6; it simply does not apply, however, in the context of August 13. Having once received workers' compensation from her work-related accidental injury of August 6, if Kirson had then attempted to bring a tort action in negligence against Suburban Hospital for that same injury, Suburban Hospital would, of course, be immune from such suit by virtue of the exclusivity provision of § 9–509(a). The workers' compensation award was the exclusive remedy available to Kirson **FOR THE AUGUST 6 WORK–RELATED FALL.** What Suburban Hospital is attempting to do, however, is to conflate the falls of August 6 and August 13 into a single legal event. They are discrete legal events, however, and do not blend or collapse into a single extended phenomenon.

The underlying injury for which Kirson eventually brought a tort action in circuit court was the August 13 fall she

included their immunity defense within their answer, they were not required to do so.

suffered while attempting, as a hospital patient, to use a bedside toilet. As Kirson lay in a hospital bed on August 13, she indisputably was doing so as a patient there to receive treatment and not "in the course of her employment." By the precise language of the statute, the term "accidental injury" encompasses only those situations where the *employee* is injured *while in the course of her employment. Miller v. Coles*, 232 Md. 522, 527, 194 A.2d 614 (1963) ("[A]n injury arises 'in the course of employment' when it occurs within the period of employment at a place where the employee reasonably may be in the performance of his duties and while he is fulfilling those duties or engaged in doing something incident thereto.")(internal quotations omitted); *Pariser Bakery v. Koontz*, 239 Md. 586, 589, 212 A.2d 324 (1965)("An injury arises out of a claimant's employment when it results from some obligation, condition or incident of his employment.") The fall of August 13 did not occur in the course of Kirson's employment and did not implicate in any way Workers' Compensation law.

In attempting to turn a suit for negligence against a hospital into a mere extension of a workers' compensation claim against an employer, Suburban Hospital cites to § 9–101(b) for the proposition that "[a]n injury 'arising out of and in the course of employment' includes aggravation of work-related injuries.' " For purposes of its entitlement to a JNOV, however, Suburban Hospital cannot remotely claim that it was a matter of undisputed fact that the hospital fall of August 13 and all of its sequellae were nothing but an aggravation of the work-related injury of August 6. Except for the logical fallacy of *"Post hoc, ergo propter hoc,"* there was no indication of any such connection. There was, moreover, extensive evidence to the contrary.

In the course of the hearing on the motion for summary judgment, the hearing judge referred to the events of August 13 as the point of departure for the present litigation and not as some mere aggravation of something that had occurred at an earlier time:

But the facts in this case involve, in essence, a slip and fall while she was at the hospital as a patient, not actively receiving treatment at the time she slipped and fell. She was going to the bathroom and she came back, and she slipped and fell. And it is due to the alleged negligence of the nurse in failing to provide adequate support that they have filed a claim.

Indeed, the entire litigation in this case concerned the extent to which later complications—the revisionary surgical procedure of August 23, the removal of the pins in March of 1994, the removal of the knee prosthesis in September of 1994, and the insertion of a new knee prosthesis in October, 1994—could be attributed back to the August 13 fall.

There would not even be an argument based on the exclusivity of workers' compensation relief were it not for the purely fortuitous circumstance that the tort defendant of August 13 by sheer coincidence happened also to be the workers' compensation employer of August 6. In the circumstances of this case, however, that mere coincidence is without legal significance.

What Shakespeare once said about "All the world's a stage" and about "one man in his time play[ing] many parts," [6] is equally true about one woman in her time and one institution in its time playing different roles. Ms. Kirson in this case was playing the part of an employee on August 6 and whether negligence occurred or not was immaterial to her entitlement, in that part, to workers' compensation. On August 13, by contrast, she was playing the very different part of a hospital patient and her entitlement to be free of the Hospital's negligence had nothing to do with any earlier employment relationship with the Hospital. She was playing a new part in a new play. On August 6, Suburban Hospital was playing the part of an employer. On August 13, it played the very different part of a health care provider.

---

6. *As You Like It,* Act II, Scene VII.

As we turn our attention to what has come to be known as the Dual Capacity Doctrine, we note that if several of our sister states had not already promulgated the doctrine, we would of necessity have invented it for ourselves, for it is the only analysis that yields a fair and a logical result in this case.

When Kirson was injured on the job on August 6, she was entitled to workers' compensation from her employer, which happened to be the Suburban Hospital. When she was subsequently admitted to a hospital for medical treatment, she took on a totally new role as a patient, just as Suburban Hospital took on a totally new role as a treating hospital. Our analysis of the duty of care owed by the Hospital to the patient will proceed in this case exactly as it would if Kirson had been taken not to Suburban Hospital but to Johns Hopkins or the Mayo Clinic. For its part, Suburban Hospital's duty of care and consequent legal obligation to this particular patient will be viewed no differently than would its duty of care and its legal obligation to any other patient with whom it had never had an employment relationship.

## THE DUAL CAPACITY DOCTRINE

In terms of the legal propriety of viewing Suburban Hospital in its capacity as an employer and Suburban Hospital in its capacity as a health care provider as discrete legal entities with no necessary relationship to each other, the analytic heavy lifting has already been done by others. What has come to be called the Dual Capacity Doctrine has, to be sure, never been formally adopted in Maryland and the issue is now before us as one of first impression. Suburban Hospital urges us to decline to adopt the Doctrine. Its only supporting argument, however, is by way of reminding us that we are not bound to adopt it:

Appellee also claims that the circuit court did not err in failing to find that Suburban Hospital and Mary Beth Smith were immune from suit pursuant to the Workers' Compensation Act in accordance with the "dual capacity" doctrine established by the courts of a handful of other states.

*These opinions, however, are not binding upon this Court, nor are they persuasive.* These extra-jurisdictional cases run counter to the plain meaning of the Maryland Workers' Compensation Act and the holdings of the Maryland Court of Appeals.

(Emphasis supplied). We agree that we are not bound. We readily embrace the Dual Capacity Doctrine, however, because we are persuaded of its merit.

*Duprey v. Shane*, 39 Cal.2d 781, 249 P.2d 8 (Cal.1952), is the progenitor case. Iva Mae Duprey was employed as a nurse by the Shane Diagnostic Foundation. During the course of her employment as a physical therapist, an accident occurred in which Duprey injured her arm and shoulder. Accordingly, Duprey consulted and was treated by Dr. Raymond Shane, a partner at the Foundation, and by Dr. John Harrison, a chiropractor employed by the Foundation. After receiving various treatments from Shane and Harrison for approximately five days, Duprey ultimately contacted another physician unrelated to the Foundation. It was then revealed that Duprey had a partial dislocation of the fourth cervical vertebrae. She was hospitalized and put into traction for two weeks. Duprey subsequently brought a malpractice action against the Foundation, Shane, and Harrison. 39 Cal.2d at 784–88, 249 P.2d 8.

The Supreme Court of California framed the issue before it as follows:

Where an employee of a doctor is injured in the course and scope of employment, and the insured employer treats the industrial injury, and does so negligently, proximately causing a new and further injury and disability, may the employee sue the employer-doctor for malpractice, or has the commission exclusive jurisdiction?

*Id.* at 789, 249 P.2d 8. The court immediately answered as follows:

It is our conclusion that, when the employing doctor elected to treat the industrial injury, * * * the doctor assumed the same responsibilities that any doctor would have assumed

had he been called in on the case.... It follows then that the employer-doctor may be sued for malpractice when he elects to treat the industrial injury.

*Id.*

The California Supreme Court addressed the Foundation's argument that, under that state's workers' compensation law, it could not be sued in tort for Duprey's injuries because it was her employer. The court explained:

(Defendants) claim, however, that the rule that the employee injured in an industrial accident can sue the attending physician for malpractice only applies when the doctor is a third person, and has no application where the attending physician is also the employer. There seems to be no authority directly in point on this question, but on principle and logic it would seem that it should make no difference to the liability of the doctor for malpractice whether the attending doctor is the employer or an insurance doctor. This fact should not affect the legal rights of the employee.... There seems to be no logical reason why the employer-doctor, when he undertakes to treat the industrial injury, should not be responsible in a civil action for his negligent acts in treating that injury. Once it is established that an action before the commission for the industrial injury is no bar to an action against the insurance doctor for malpractice, it would seem to follow that *the employee does not lose his right to such an action simply because the employer who happens to be a doctor treats the injury.* In such event, *the employer-doctor is a "person other than the employer"* within the meaning of the [relevant Workers' Compensation provision].

39 Cal.2d at 792–93, 249 P.2d 8 (emphasis supplied). Under the facts of *Duprey,* the Foundation had taken on a role as a "third person" under the workers' compensation law and Duprey could maintain a malpractice action against it:

It is true that the law is opposed to the creation of a dual personality, where to do so is unrealistic and purely legalistic. But where, as here, it is perfectly apparent that the

person involved, Dr. Shane, bore towards his employee two relationships, that of employer and that of a doctor, there should be no hesitancy in recognizing this fact as a fact. . . . *We conclude, therefore, that an employee injured in an industrial accident may sue the attending physician for malpractice if the original injury is aggravated as a result of the doctor's negligence, and that such right exists whether the attending doctor is the insurance doctor or the employer.*

*Id.* at 793, 249 P.2d 8 (emphasis supplied).

In *Guy v. Arthur H. Thomas Co.*, 55 Ohio St.2d 183, 378 N.E.2d 488 (1978), Carolyn Guy was employed as a laboratory technician at the Christ Hospital. As part of her job at the hospital, Guy operated a magnematic blood gas apparatus that utilized mercury. Guy ultimately contracted mercury poisoning from the use of the apparatus. She sued the hospital, claiming that the employees of the hospital negligently failed to diagnose her condition properly, thus aggravating her original condition. 378 N.E.2d at 488–89. Guy sought no relief from the hospital with regard to the original contraction of the disease, but only for the aggravation of it as a result of the alleged misdiagnosis. The issue before the court was "whether the remedy under the Ohio Workers' Compensation Law . . . is exclusive as to an employer's liability." *Id.* at 489.

After quoting extensively from the California Supreme Court's decision in *Duprey*, the Ohio court concluded:

We find the logic expressed in *Duprey* . . . to be compelling and applicable herein. Appellee's argument is that the Ohio workers' compensation requires us to ignore the fact that appellee hospital was not only the employer of appellant, but also the treating hospital and, as such, charged with the obligations that arise in a hospital-patient relationship. . . . Appellant's need for protection from malpractice was neither more nor less than that of another's employee. *The appellee hospital, with respect to its treatment of the appellant, did so as a hospital, not as an employer, and its*

*relationship with the appellant was that of a hospital-patient with all the concomitant traditional obligations.* *Id.* at 492 (emphasis supplied).

In *McCormick v. Caterpillar Tractor Co.,* 85 Ill.2d 352, 53 Ill.Dec. 207, 423 N.E.2d 876 (1981), the Illinois Supreme Court quoted with approval Larson on *Workmen's Compensation* as it recognized by name the Dual Capacity Doctrine as an exception to the exclusive remedy provisions of Workers' Compensation laws:

> In relatively recent years *an exception to the exclusive-remedy provision of the Workmen's Compensation Act has developed under what has come to be called the dual-capacity doctrine.* Professor Larson, in his treatise on Workmen's Compensation Laws, stated: "Under this doctrine, an employer normally shielded from tort liability by the exclusive remedy principle may be liable in tort to his own employee if he occupies, in addition to his capacity as employer, a second capacity that confers on him obligations independent of those imposed on him as an employer." (2A A. Larson, *Workmen's Compensation* § 72.80, at 14–112 (1976))....
>
> ... *The decisive test to determine if the dual-capacity doctrine is invocable* is not whether the second function or capacity of the employer is different and separate from the first. Rather, the test *is whether the employer's conduct in the second role or capacity has generated obligations that are unrelated to those flowing from the company's or individual's first role as an employer.* If the obligations are related, the doctrine is not applicable.

423 N.E.2d at 878 (emphasis supplied).

The California Supreme Court held to a like effect in *D'Angona v. County of Los Angeles,* 27 Cal.3d 661, 667, 613 P.2d 238, 166 Cal.Rptr. 177 (1980):

> [T]he decisive test of dual capacity is whether the nonemployer aspect of the employer's activity generates a different set of obligations by the employer toward an employee.

> Thus, *since a doctor's obligation toward his patient arises because he undertakes to render medical treatment, if he treats an employee rather than paying another for treatment he should be liable as a doctor rather than as an employer.*

(citing 2A Larson, *Workmen's Compensation Law* (1976), § 72.80, p. 14–117)(emphasis supplied); *See also Ray v. District of Columbia,* 535 A.2d 868, 871 (D.C.App.1987); *Jefferson Med. College Hosp. v. Savage,* 7 Pa.Cmwlth. 35, 298 A.2d 694 (1972) (Invoking dual capacity doctrine and holding that "the crucial factor in the present case is that Miss Savage's injuries in the hospital were new and independent injuries and were not an aggravation or expansion of her injury sustained in her fall.").

The fact that the cases applying the Dual Capacity Doctrine have, generally speaking, been medical malpractice cases and that the present case is a suit for negligence is a distinction without a difference. Medical malpractice is but a species of negligence. What the Dual Capacity Doctrine establishes is that Suburban Hospital, albeit an employer on an earlier occasion, can also be a tort defendant in its capacity as a health care provider. *See* Rosalyn B. Bell, *Maryland Civil Jury Instructions and Commentary,* § 37.01 p. 844 (1993) ("Medical malpractice cases are governed by the same general principles that govern negligence cases."), citing to *Benson v. Mays,* 245 Md. 632, 636, 227 A.2d 220 (1967), and *Suburban Hosp. Ass'n v. Mewhinney,* 230 Md. 480, 484, 187 A.2d 671 (1963).

We hold that Suburban Hospital possesses such a dual capacity in this case. It was involved in an employer-employee relationship with Kirson as far as any workers' compensation claim for the August 6 fall was concerned. It was involved in a very different hospital-patient relationship with Kirson as far as the August 13 fall was concerned. By application of the Dual Capacity Doctrine, the exclusivity immunity claimed by Suburban Hospital is not available to it.

## DENIAL OF SMITH'S MOTION FOR JNOV BASED ON INSUFFICIENCY OF THE EVIDENCE

Smith asserts an alternative and independent reason as to why the trial court should have granted her Motion for JNOV. She maintains that there was insufficient evidence as a matter of law to establish that she had acted negligently in any way. We agree. Even when considering the evidence in the light most favorable to Kirson, the evidence was wholly insufficient to establish Smith's negligence. At trial, Kirson attempted to establish Smith's liability on a theory of negligent supervision. Nancy Lenaghan, Kirson's expert in the area of nursing standards of care, testified:

> Ms. Smith had an obligation to ensure that the transfer [of Kirson] was carried out safely. Part of delegation is supervision. Supervision means being readily available. Mary Beth Smith should have been checking back on that patient and making sure that everything was going well. . . .

Lenaghan further testified, however, that Smith was not required to be physically present in the room during the entire action of transferring Kirson first to the toilet and then back into her bed.

In *Franklin v. Gupta*, 81 Md.App. 345, 353–54, 567 A.2d 524 (1990), we explained:

> *"The general principles which ordinarily govern in negligence cases also apply to medical malpractice claims under Maryland law.* A prima facie case of medical malpractice must consist of evidence which (1) establishes the applicable standard of care, (2) demonstrates that this standard has been violated, and (3) develops a causal relationship between the violation and the harm complained of. . . . *As in any other cases founded upon negligent conduct,* the burden of proof in a medical malpractice claim rests upon the plaintiff."

(quoting *Weimer v. Hetrick*, 309 Md. 536, 553, 525 A.2d 643 (1987))(emphasis supplied). We additionally noted:

"There is a presumption that the doctor [or other health care professional] has performed his medical duties with the requisite care and skill. . . .

* * *

"It is well established by the case law in this State that *the mere fact that an unsuccessful result follows medical treatment is not of itself evidence of negligence.*"

*Id.* at 353, 567 A.2d 524 (brackets in original) (quoting *Lane v. Calvert,* 215 Md. 457, 462–63, 138 A.2d 902 (1958))(emphasis supplied).

Although witnesses testified that Smith had a duty to instruct Paul properly and effectively with regard to Kirson's bedside transfer, the record is devoid of evidence that Smith did not adequately fulfill that duty. As the case law clearly indicates, the presumption rests in Smith's favor that she did, in fact, perform her duties adequately. Kirson failed to overcome that presumption by presenting any evidence that Smith did not adequately instruct Paul and, therefore, that Smith deviated from the appropriate standard of care. The trial court thus erred in denying Smith's motion for JNOV. We accordingly reverse the judgment that the jury rendered against Smith.

## ADMISSIBILITY OF EVIDENCE OF PAYMENTS MADE BY SUBURBAN TO KIRSON

The appellants complain that the trial court erroneously refused to permit them to question Kirson at trial about the workers' compensation award she had previously received. They also complain that the court erroneously refused to admit documentary evidence of payments made by Suburban Hospital to Kirson after the August 13 fall, allegedly totaling some $186,000 for a combination of medical expenses, lost wages, and impairment. According to the appellants,

[h]ad testimony and evidence of Suburban Hospital's payments been admitted, the jury would have learned that [Kirson] already had been compensated for her injuries. In

that light, the jury likely would not have awarded [Kirson] any compensatory damages. This is logical given that the amount of these payments exceeded the jury's award.

The appellants advance two legal arguments, both of which we find to be flawed.

## A. The Dubious Applicability of Cts. & Jud. Proc. Art., § 3–2A–08(a)

■ As justification for why they should have been permitted 1) to question Kirson at trial about the workers' compensation award she had received and 2) to offer documentary evidence of payments made by Suburban Hospital to Kirson, the appellants rely on Md.Code Ann., Cts. & Jud. Proc., § 3–2A–08(a), which provides:

(a) *Evidence of payments inadmissible; deduction from award.*—Evidence of advanced payments made pursuant to § 19–104(b) of the Insurance Article [7] is not admissible in any ... judicial proceeding for damages due to medical injury until there is an award ... or a verdict, in the case of judicial proceedings, in favor of the claimant and against the person who made the advanced payments. Upon finding of such an award or verdict ... the trier of fact shall make a finding of total damages, and shall then deduct whatever amounts it finds were paid by or on behalf of the defendants pursuant to § 19–104(b) of the Insurance Article. The net amount, after this deduction, shall be entered as its award or verdict.

According to the appellants, pursuant to the language of § 3–2A–08(a), the trier of fact was required to "deduct whatever amounts" it found was paid to Kirson by Suburban Hospital and then "[t]he net amount, after this deduction, shall be entered as its award or verdict."

We do not find § 3–2A–08(a) to have any pertinence to the argument the appellants predicate upon it. At the outset, the

---

7. Section 19–104(b) of the Insurance Article deals with health care malpractice insurance and payments made by an insurer to claimants.

applicability of Subtitle 2A generally to the negligence trial in this case is highly dubious. What is now Subtitle 2A of the Cts. & Jud. Proc. Art. was enacted by ch. 235 of the Laws of Maryland of 1976. Its title is "Health Care Malpractice Claims." Ch. 235 of the Laws of 1976 explained that the subtitle was enacted

> [f]or the purpose of providing for a mandatory arbitration system for all medical malpractice claims in excess of a certain amount; providing for the creation of a Health Claims Arbitration Office under the Executive Department; providing for the selection of an arbitration panel by the parties from a list of certain qualified persons chosen by the Director of the Health Claims Arbitration Office; providing for the elimination of a specific dollar amount in pleadings with a certain exception; providing for the panel to determine liability and award damages; providing for an appeal to the Courts from the decision of the arbitrators; providing for approval of attorney fees and generally relating to claims filed with the Health Claims Arbitration Office; providing that insurers may settle claims without restriction and authorizing insurers to prepay certain costs of claimants without prejudice; and providing for a change in the statute of limitations for minor relating to medical malpractice claims.

Basically Subtitle 2A governs and is relevant to health care arbitration. *See Kim v. Comptroller of the Treasury,* 350 Md. 527, 537, 714 A.2d 176 (1998) ("The Maryland Health Care Malpractice Claims Act ... requires 'the submission of [medical] malpractice claims against health care providers to an arbitration proceeding as a condition precedent before maintaining a tort action in the circuit court.'"); *Goodwich v. Nolan,* 343 Md. 130, 149 n. 13, 680 A.2d 1040 (1996); *Linzey v. Carrion,* 103 Md.App. 116, 121–22, 652 A.2d 1154 (1995), *rev'd on other grounds,* 342 Md. 266, 675 A.2d 527 (1996).

Unlike most of the other sections in Subtitle 2A which deal exclusively with arbitration under the direction of the Health Claims Arbitration Office, § 3–2A–08(a) does, to be sure, refer to admissibility "in any arbitration or judicial proceeding" and

does refer to "an award, in the case of arbitration proceedings, or a verdict, in the case of judicial proceedings." Even granting, therefore, some arguable pertinence of the section to the trial now under review, the section is nonetheless totally inapplicable to serve the appellants' purposes for two other reasons.

The section does, indeed, deal with the admissibility of evidence of advance payments but it expressly forbids such admissibility until after there is "a verdict, in the case of judicial proceedings." It is only "upon the finding of such ... verdict," that certain evidence shall be received and certain calculations shall be made based upon advance payments.

On this appeal, however, the appellants expressly claim that they "were not permitted to question appellee regarding her workers' compensation claim and the award she received." The trial ruling in question came during the cross-examination of Ms. Kirson early in the trial and would not qualify for § 3–2A–08(a)'s limited admissibility only after a verdict has been rendered. By the same token, the appellants' complaint that they "were not permitted to introduce documentary evidence of payments made by Suburban Hospital" also dealt with an evidentiary ruling that occurred before the jury was even asked to deliberate. In this respect alone, § 3–2A–08(a) does not remotely serve the purpose for which the appellants offer it.

As a basis for possible relief for the appellants, § 3–2A–08(a) fails to qualify for yet another reason. It deals exclusively with "advanced payments made pursuant to § 19–104(b) of the Insurance Article." Section 19–104, in turn, deals exclusively with "Health Care Malpractice Insurance."

When in both its cross-examination of Ms. Kirson and in its offering of documents, the appellants failed to get the evidence they sought admitted, there was no remote mention of § 19–104 of the Insurance Article. It was clear, moreover, that what was being offered was not some advance payment of health care malpractice insurance but only evidence of the workers' compensation award for the work-related accident of

August 6. When, at a bench conference, counsel for Suburban Hospital was asked what it anticipated developing in the cross-examination of Ms. Kirson, counsel replied:

> I anticipate asking whether she made a comp claim, whether there was an award, whether she had to pay any of her medical bills, whether she received comp while she was off from work, whether there is an award—

It is equally clear that the documents offered by the appellants referred exclusively to payments made to Ms. Kirson by Suburban Hospital as a result of the award of the Workers' Compensation Commission of December 6, 1996, which award was for the work-related accident of August 6, 1993. As a legal predicate for the admissibility of the evidence in issue, § 3–2A–08(a) is simply off the chart.

## B. The Collateral Source Rule

■ As a defensive tactic, the appellants attempt to forfend any assertion by Kirson or by the Court *sua sponte* of the collateral source rule. The Restatement 2d of Torts, § 920A(2) (1977) states the rule:

> Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or part of the harm for which the tortfeasor is liable.

In *Motor Vehicle Admin. v. Seidel*, 326 Md. 237, 253, 604 A.2d 473 (1992), the Court of Appeals, in discussing the collateral source rule, explained:

> Since 1899, the collateral source rule has been applied in this State to permit an injured person to recover in tort the full amount of his provable damages *regardless of the amount of compensation which the person has received for his injuries from sources unrelated to the tortfeasor.*

(Footnote omitted; emphasis supplied). Additionally, in quoting from the comment following § 920A(2) of the Restatement, the Court explained:

> "Payments made or benefits conferred by other sources are known as collateral-source benefits. They do not have the

effect of reducing the recovery against the defendant. The injured party's net loss may have been reduced correspondingly, and to the extent that the defendant is required to pay the total amount there may be a double compensation for a part of the plaintiff's injury. But it is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor. If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance or by making advantageous employment arrangements, the law allows him to keep the benefit for himself. . . . The law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him."

*Id.* at 254, 604 A.2d 473 (quoting Restatement 2d of Torts § 920A(2) comm. b (1977)).

In an effort to head off the otherwise preclusive effect of the collateral source rule on this contention, the appellants rely upon the fact that Suburban Hospital paid the workers' compensation award for the August 6 fall and the exact same Suburban Hospital was also the tortfeasor required to pay an award for its negligence in permitting the August 13 fall. The argument is that Suburban Hospital is identical with itself and not collateral to itself and that, by definition, the collateral source rule cannot apply.

What the appellants overlook in this regard is our embrace of the Dual Capacity Doctrine. We have held that Suburban Hospital in its capacity as the employer of August 6 is not for purposes of this case identical with Suburban Hospital as the medical care provider of August 13. In this case, Suburban Hospital wears two hats or has a dual identity. Whatever workers' compensation award it may have paid as the employer of August 6 was collateral to the subsequent award against it as the treating hospital of August 13. In that respect, it was collateral to itself and the collateral source rule would bar its effort to reduce the judgment against it in its second

capacity by showing payments made by it in its first and very different capacity.

## CROSS–EXAMINATION OF SUSAN HOWELL

 The appellants called Susan Howell, R.N., an expert in the area of orthopedic nursing, to testify on their behalf. Specifically, Howell testified regarding the appropriate standard of care attributable to Smith and Anderson. During the cross-examination, the following occurred:

Q: Ma'am, isn't it true that under the Board of Nursing rules and regulations for the State of Maryland, that a delegating nurse remains personally accountable for any task that she delegates to an unlicensed person?

[Counsel for appellants]: Objection.

The Court: Overruled.

A: I can't speak to the specifics of the law.

Q: You have not been asked to review the rules and regulations of the Board of Nursing by counsel before coming in and rendering the opinions with respect to delegation, have you?

[Counsel for appellants]: Objection.

The Court: Overruled.

A: The law, no I haven't.

By Mr. Costello:

Q: And you would agree with me that nurses acting in the State of Maryland would be bound to adhere to the rules and regulations promulgated by the Board of Nursing of the State of Maryland, do you not?

Mr. Joseph: Objection.

The Court: Sustained.

The appellants' claim is that the questioning by Kirson's attorney "was a misstatement of the law that went uncorrected by the trial court." The several sentences arguably in issue were, in form at least, questions and not statements. No objection was made that they were in fact statements masquerading as questions. The first such question produced the

innocuous response, "I can't speak to the specifics of the law." It clearly was not prejudicial. The second of the two was objected to and the objection was sustained.

The appellants, therefore, got everything for which they asked. The witness was not permitted to answer the second allegedly objectionable question. With respect to the alleged lack of some corrective instruction on the part of the trial judge, the simple answer is that no such corrective instruction was ever requested. We see no error.

## QUESTIONING OF DR. GORAL

Dr. Antoni Goral testified at trial as an expert witness for Kirson regarding the duty owed by the appellants to Kirson. On re-direct examination, Dr. Goral was read portions of his pre-trial deposition in which he had inferred that Smith had a duty to instruct Paul that Paul was not to leave Kirson alone. Counsel for appellants objected to the reading of the deposition at trial on the specific ground that it was leading. The appellants argue before us that the trial court erred in allowing the testimony because it was 1) impermissibly leading and 2) inadmissible hearsay.

As to the latter of the two arguments, the appellants never objected to Dr. Goral's testimony at trial on hearsay grounds. That issue, therefore, has not been preserved for appellate review. *See* Maryland Rule 2–517(a); *Jeffries v. State,* 113 Md.App. 322, 341, 688 A.2d 16 (1997) ("[W]hen the grounds for an objection are stated by the objecting party . . . only those specifically stated are preserved for appellate review; those not stated are deemed waived.")

In the course of Kirson's cross-examination of Dr. Goral, counsel had Dr. Goral refer repeatedly to his pretrial deposition. His attention was directed to very specific and particular parts of it and he read those selected passages to the jury. That selected quotation from the deposition created the erroneous impression that he ascribed full supervisory responsibility to Paul and little, if any, to Smith.

In an effort to restore the balance and to convey the fuller import of his deposition in total context, counsel on redirect examination referred him to other selected passages that served to rectify the earlier imbalance. Actually, we find only a single instance where counsel for the appellants objected, simply saying, "It's leading." The trial judge overruled that sparse objection without comment. Without agreeing for a moment that the question was, indeed, leading, it is enough to point out, *arguendo,* that Md. Rule 5–611(c) provides that "the allowance of leading questions rests in the discretion of the trial court." We see no abuse of discretion in this case.

## THE CROSS–APPEAL

In addition to her arguments that this Court 1) should dismiss the appeal of Aparangi Paul and 2) should, for a different reason, dismiss the appeals of the Suburban Hospital and Mary Beth Smith, the appellee/cross-appellant raises, on her cross-appeal, two substantive contentions. The first concerns the allowance of the testimony of a defense expert.

## EXPERT TESTIMONY OF DR. HINKES

During the trial, Dr. Clifford Hinkes, a board-certified orthopaedist, testified as an expert witness for the defense on the issue of the causation of Kirson's injuries. Specifically, Dr. Hinkes was called to rebut the testimony of Dr. Goral, the expert witness offered by Kirson, who had earlier expressed his opinion that the procedures which Kirson had undergone from March through October of 1994 were all causally related to the August 13 fall. Hinkes testified, over Kirson's objection, that Kirson could have developed bursitis necessitating hardware removal from her knee even if the August 13 fall had never occurred. Kirson now argues that, "[i]n essence, the defendants were allowed to suggest a theory to the jury, *i.e.,* that the bursitis, infection, and knee replacement might have happened even if the fall of August 13, 1993 had not occurred on the basis of an impermissible factual predicate."

Kirson in her brief suggests a hodgepodge of reasons why Dr. Hinkes's testimony was improper. First, she seems to argue [8] on appeal that Hinkes testified as to causation without the proper foundation or knowledge of Kirson's condition: "Dr. Hinkes did not review or receive the hospital records pertaining to the bursitis, removal of screws, treatment of infection, or total knee replacement until he reviewed them with defense counsel at 5:00 p.m. on the Monday before the start of the trial just before his deposition." Second, Kirson complains that Hinkes was asked leading questions on direct examination with regard to whether the subsequent development of bursitis would have necessitated hardware removal at a later date. Third, Kirson argues that the trial court's error "was compounded" "by allowing Defendant Paul to 'waive' any direct examination of her own expert and then cross-examine him and take him through an entire new direct examination after plaintiff had cross-examined this essential witness." [9] Finally, Kirson concludes that "Dr Hinkes' testimony, based upon a hypothetical not in evidence, *was immaterial and irrelevant.* To that extent it should not have been permitted." (Emphasis supplied; citation omitted).

Of those four "suggested reasons" why Hinkes's testimony was improper, the only one which was raised both at trial and before this Court was the fourth, *i.e.*, whether Hinkes's testimony was immaterial and irrelevant. That is the only issue which we shall address.

---

**8.** We emphasize "seems to" because Kirson includes no argument other than to make this bald assertion, and three sentences later in her brief she concedes that despite her claim of a scheduling violation on Hinkes's part, "[a] compromise was thereafter reached with the Court's involvement."

**9.** We are at a loss as to what Kirson is arguing in this third suggestion. The single sentence does nothing to shed light on precisely what it is she complains is error. As this Court has stated, "[w]e cannot be expected to delve through the record to unearth factual support favorable to [Kirson] and then seek out law to sustain [her] position." *von Lusch v. State,* 31 Md.App. 271, 282, 356 A.2d 277 (1976), *rev'd on other grounds,* 279 Md. 255, 368 A.2d 468 (1977). Thus, we decline to attempt to decipher what Kirson is arguing and address it further.

"As a general rule, the admissibility of expert testimony is an area in which the trial court is given broad discretion, and it rarely constitutes a basis for reversal." *Cook v. State*, 84 Md.App. 122, 138, 578 A.2d 283 (1990)(citing *Simmons v. State*, 313 Md. 33, 43, 542 A.2d 1258 (1988)). Additionally, "[e]videntiary rulings, particularly those hinging on relevance, are entrusted to the wide discretion of the trial judge. An appellate court will not second-guess such a decision absent a clear abuse of the trial court's discretion." *Jeffries v. State*, 113 Md.App. 322, 339, 688 A.2d 16 (1997); *Smallwood v. Bradford*, 352 Md. 8, 27, 720 A.2d 586 (1998).

Contrary to Kirson's argument, there was ample evidence to suggest that Hinkes's opinions as to causation were both relevant and material. The issue of causation of Kirson's post-August 1993 ailments (*i.e.*, the bursitis, infection, removal of screws and second knee prosthesis replacement) was hotly disputed at trial. Kirson claimed that those injuries would not have occurred had it not been for the August 13 fall. The appellants, on the other hand, claimed that, more likely than not, the ailments would have occurred regardless of the fall. Dr. Goral testified in support of Kirson's position. Dr. Hinkes testified in support of the appellants' position. Thus, the testimony was clearly relevant. To the extent that Kirson claims that Hinkes's testimony was based on a "hypothetical not in evidence," that argument too lacks any merit. *See Sippio v. State*, 350 Md. 633, 653, 714 A.2d 864 (1998) ("A factual basis for expert testimony may arise from a number of sources, such as . . . facts related to an expert through the use of hypothetical questions.")(citing 9 Lynn McClain, *Maryland Evidence*, § 703.1 at 236–37 (1987)); *see also* Maryland Rule 5–702. In sum, Kirson has failed to persuade us that the trial court committed an abuse of discretion in permitting Dr. Hinkes's expert testimony in the area of causation.

## JNOV IN FAVOR OF ANDERSON

Anderson was the charge nurse on duty at the time of Kirson's August 13 fall. On June 22, 1998, Anderson moved

for a JNOV, arguing specifically that Kirson "did not establish a *prima facie* case against Mary Anderson" because "[t]here was no testimony or evidence from which a jury rationally could have found that Mary Anderson . . . deviated from standards of care, and that any such deviation caused injury to [Kirson]." The trial court granted Anderson's motion on August 13, 1998. Kirson now claims that the trial court's actions in granting the motion were erroneous. Specifically, Kirson argues that she "had made a *prima facie* case of *negligence* against the charge nurse, Mary Anderson." (Emphasis supplied).

Before reaching the merits of the argument, we first address Kirson's suggestion that Anderson had not preserved her entitlement to move for a JNOV because Anderson "failed to renew her Motion for Judgment or did so ineffectively" at the close of all of the evidence. Prior to closing arguments the court asked counsel whether counsel had any motions. The transcript then reflects the following:

Mr. Buckner: Yes, Your Honor. I would make a motion for judgment.

The Court: All right. Renewing the same reasons that were given at the end of the plaintiff's case?

Mr. Buckner: Absolutely, Your Honor.

The Court: Well, I am going to let it go to the jury, although *I frankly have serious reservations about Ms. Anderson* and Ms. Stephens *remaining in the case,* but I will tell you I will continue it under advisement. I will reserve on it.

Mr. Buckner: I would renew mine for the same reasons.

The Court: I will deny the motion as to Ms. Paul.

(Emphasis supplied). Mr. Buckner represented Paul at trial. Mr. Joseph represented Suburban Hospital, Anderson, Stephens, and Smith. Clearly, when reading the entire portion of the transcript, an error occurred in the transcription of counsel's names. The first motion, transcribed as being made by Mr. Buckner, could only logically have been made by Mr. Joseph, as the trial court responded to counsel's motion specif-

ically as to Smith and Anderson, who were both Joseph's clients. The comment by Mr. Buckner that "I would renew mine for the same reasons," also contemplates that a different individual is speaking than the person who made the first motion for judgment. In any event, the court explicitly denied the motion for judgment as to Anderson. Kirson, therefore, cannot rely on an error in transcription for the proposition that the issue is unpreserved.

■ Maryland Rule 2–532(e) provides in relevant part:

> If a verdict has been returned, the court may ... grant the motion, set aside any judgment entered on the verdict, and direct the entry of a new judgment.

On appeal, when reviewing the grant of a motion JNOV,

> we are bound to consider all the evidence together with inferences fairly deducible therefrom in the light most favorable to the party against whom the motion is made.

*Cluster v. Cole,* 21 Md.App. 242, 249, 319 A.2d 320 (1974).

■ Even considering the evidence in the light most favorable to Kirson, we are not persuaded that the trial court erred in granting Anderson's Motion for JNOV. At trial, Kirson attempted to establish Anderson's liability on a theory of strict liability and she called various witnesses to support her theory that Anderson, acting in a supervisory position, was "responsible for the care and treatment" of Kirson. Nancy Lenaghan, R.N., testified on behalf of Kirson as follows:

> A recognized principle in nursing is that the responsibility passes up the chain of command and that the person who is highest in that hierarchy is responsible and all the way down the chain to the person who actually performs the task.

On cross-examination of Ms. Lenaghan, the following also ensued:

> Q: Am I correct that you can't say based upon the material that you reviewed what Mary Anderson did, if anything, that departed from the standards of care?

* * *

A: Only insofar as when there is negligence at the bedside, that responsibility passes up the chain of command and that is a pretty well recognized principle in nursing.

Q: So if anything happens by any of the RNs on the unit while Mary Anderson is the charge nurse, she is responsible, is that correct?

A: That is correct.

Q: And that is your only criticism of Mary Anderson?

A: Right.

The deposition testimony read to the jury of Mary Monan, a director of risk management at Suburban Hospital, also explained:

There is a concept—and it is accepting in nursing—that nurses are responsible if something happens on the unit. And then it goes up to the next level nurse and the next level nurse and the next level nurse.

Kirson claims before us that there was sufficient evidence of Anderson's negligence to sustain the jury's verdict, and, accordingly, the trial court should not have granted Anderson's Motion for JNOV. To the contrary, all of the testimony cited by Kirson in her brief in support of her argument establishes, at best, perhaps a theory of Anderson's accountability on strict liability grounds. Strict liability refers to the imposition of liability without fault. Kirson's assertions, both at trial and before our Court, that Anderson was negligent, lack any factual basis. *See Board of County Commr's of Garrett County v. Bell Atlantic–Maryland, Inc.*, 346 Md. 160, 177, 695 A.2d 171 (1997) ("'Due care' is a negligence concept, and therefore inconsistent with the genre of strict liability or liability without fault."). We are unpersuaded that the trial court committed error in granting Anderson's Motion for JNOV.

*JUDGMENT REVERSED AS TO MARY BETH SMITH ONLY; IN ALL OTHER ASPECTS JUDGMENTS AF-*

*FIRMED; COSTS TO BE PAID TWO–THIRDS BY SUB-URBAN HOSPITAL AND ONE–THIRD BY KIRSON.*