763 A.2d 185

**SUBURBAN HOSPITAL, INC. et al.**

v.

**Phyllis R. KIRSON.**

**No. 2, Sept. Term, 2000.**

Court of Appeals of Maryland.

Dec. 8, 2000.

142

144

Michael I. Joseph (S. Allan Adelman, Godard, West & Adelman, Rockville; H. Kenneth Armstrong, Armstrong, Donohue, Ceppos & Vaughan, Rockville), on brief, for petitioners/Cross-Respondents.

John F.X. Costello (McCarthy & Costello, LLP, on brief), Lanham, for Respondent/Cross-Petitioner.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY,* RAKER, WILNER, CATHELL and HARRELL, JJ.

RODOWSKY, Judge.

Maryland Code (1991), Title 9 of the Labor and Employment Article (LE) is the Maryland Workers' Compensation Act (the Act). LE § 9–509 in part provides:

"(a) *Employers.*—Except as otherwise provided in this title, the liability of an employer under this title is exclusive.

"(b) *Covered employees and dependents.*—Except as otherwise provided in this title, the compensation provided under this title to a covered employee or the dependents of a covered employee is in place of any right of action against any person."

We granted certiorari in this action primarily to determine whether an employer-hospital enjoys the exclusivity defense under § 9–509 where the employer is sued by an employee for tort damages for personal injuries resulting from the negligent medical treatment of a work-related injury. The Court of Special Appeals, applying the "dual capacity" theory, denied the defense. *Suburban Hosp. v. Kirson*, 128 Md.App. 533, 552, 739 A.2d 875, 885 (1999). That court viewed the employer

---

* Rodowsky, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

"in its capacity as an employer and ... in its capacity as a health care provider as discrete legal entities with no necessary relationship to each other." *Id.* at 547, 739 A.2d at 882.

In addition to the above issue of substantive law, the record in this case also reveals a failure to comply with the separate document requirement for the entry of judgment under Md. Rule 2–601. Nevertheless, we shall hold in Part II, *infra*, that there is appellate jurisdiction. With respect to the merits of the principal question, we shall hold in Part IV.C, *infra*, that workers' compensation is the employee's exclusive remedy against the employer-hospital for the negligent care.

I

The employer, Suburban Hospital, Inc. (Suburban), is a petitioner and cross-respondent in this Court. The employee, Phyllis R. Kirson (Kirson), is the respondent and cross-petitioner. Kirson fractured her right femur when, on August 6, 1993, she slipped and fell in the operating room at Suburban while she was working as a nurse. She was immediately taken to the Suburban emergency room and then admitted to that hospital. The next day Kirson underwent surgical repair which involved the insertion of a metal plate and screws at the break point, just above the total prosthesis that had replaced Kirson's right knee in 1991.

On August 13, 1993, Kirson, while recuperating from the August 7 surgery, fell in her hospital room at Suburban. It is undisputed before us that the immediate cause of the fall of August 13 was the negligence of Aparangi Paul (Paul), a patient care technician who is a petitioner in this Court. Nor is there any dispute over Suburban's vicarious liability for the negligence of Paul if Suburban does not enjoy the exclusivity defense. At the time of the August 13 fall one of the cross-respondents, Mary Beth Smith (Smith), was the nurse assigned to Kirson, and the remaining cross-respondent, Mary Anderson (Anderson), was the charge nurse on duty. Their tort liability is disputed.

Many complications followed Kirson's falls. Suburban, a self-insurer for workers' compensation, paid Kirson temporary total disability compensation from August 7, 1993, to May 10, 1995. Following a hearing, the Workers' Compensation Commission (the Commission), by an order dated November 29, 1996, found that Kirson had sustained an accidental injury arising out of and in the course of her employment on August 6, 1993. The Commission ordered that Suburban pay 129 weeks of permanent partial disability compensation and that the Subsequent Injury Fund then pay 146 weeks. The Commission ordered Suburban to pay all medical expenses.[1]

The present tort action was filed on July 11, 1996, accompanied by a waiver of arbitration under the Health Claims Arbitration Act. It is sufficient for present purposes to consider that the defendants, as named in an amended complaint filed on August 6, 1996, were Suburban, Anderson, Smith, Paul, and one Carol Stephens (Stephens) who is not a party to this appeal.

Suburban first raised the exclusivity defense in a motion for summary judgment filed sixteen months before trial. Anderson and Smith joined in the motion, contending that they were entitled to the defense because of their supervisory positions. In opposition Kirson argued the possible lack of a causal connection between the August 6 and August 13 falls, and she also argued the dual capacity doctrine. The circuit court, uncertain whether any facts that might be in dispute were material, denied the motion.[2]

---

1. Although they were not admitted at trial, Suburban proffered the Commission award and the ledger of compensation and medical payments. We incorporate the proffer in the facts in this opinion because the proffered facts are the basis for the principal question presented.

2. The circuit court reasoned as follows:

 "THE COURT: I am torn as to what to do. In my heart of hearts, I believe that the Workers' Compensation statute would bar the claim of the plaintiff against Suburban Hospital. I think it is clear that the principle of law that the plaintiff was in the hospital and that she was receiving the care on August 13 that she was receiving as a result of

About two weeks before trial Suburban renewed its motion for summary judgment on exclusivity grounds. In essence it contended that the general facts that we have set forth above were the only material facts. Kirson again argued the absence of a causal connection between the fall of the thirteenth and that of the sixth, and she again argued dual capacity. In colloquy with counsel at that hearing the court, in part, observed:

> "The injury that [Kirson] suffered on August 13, it is clear to me, is a direct result—I mean, she is there being treated for the injury that occurred on August 6th. So, therefore, Suburban Hospital, as the employer—not as the hospital, but as the employer—benefits from the exclusivity provision of the [Act]."

Observing that "even though [it had] a difficult time finding a material fact that would allow the hospital to remain in this lawsuit," the circuit court denied the motion, saying, "I am going to let it go to the jury or at least we will start the jury trial with everybody in it."

At that same hearing Kirson moved *in limine* to prevent any mention of workers' compensation, opening her argument by saying, "If they are going to defend this on the exclusivity doctrine—." The court, however, interrupted and ruled, "That is a legal issue; that is not something that should be before the jury." When Suburban then argued that it should be entitled to demonstrate that it had paid $186,000 in compensation, the court ruled that this evidence was barred by the

---

her Workers' Comp related injury on August 6th would then bar her claim against the hospital.

"I am also sensitive to what we have been told repeatedly by the Court of Appeals; that if there is an issue of material fact in dispute, that a jury must receive it. I have a difficult time with the material facts that have been alleged to be in dispute by the plaintiff given the sequence of events, the timing. There may be facts in dispute, but I am not sure if they are material facts that are in dispute.

"But the extent of the—the nature of the affidavit, the extent of the affidavits and the facts that the plaintiff has set forth as being in dispute, at least at this point, I am going to reluctantly allow them to go for a jury's consideration."

collateral source rule. The court stated, "I am not going to permit anything before the jury as to the amount of compensation that has been paid through the [Act]."

Accordingly, the action went to trial before the jury as one involving a claim of negligently inflicted injury (August 13) superimposed on a pre-existing condition (the break in the femur of August 6).

At trial Kirson gave the following description of the fall of August 13. Shortly after breakfast Paul and a nurse, whom Kirson believed to be Smith, responded to Kirson's call button. Kirson wanted to use the bedside commode. As she sat up at the edge of her bed, Kirson told the two caregivers that she was " 'a little light-headed.' " The two assisted Kirson to the commode and told Kirson to push the button when she was ready to return to bed and someone would return to assist her. After using the commode, Kirson again pushed the call button, and only Paul responded. Before Kirson stood up she told Paul, " 'I still feel a little dizzy.' " Paul told Kirson to " 'wait a minute.' " From a corner of the hospital room Paul obtained a walker that had not been adjusted for Kirson's use. Paul placed the walker directly in front of Kirson so that she could stand while using the walker for support. When Kirson stood, Paul took the container out of the commode and started toward the bathroom to empty the container's contents. When Paul was about six feet from Kirson, the latter exclaimed, " 'Oh, I feel dizzy.' " Kirson stated that she then reached for the walker, "but it was too high to . . . support and it toppled, and I went and it went, and I began to scream. . . ."

Kirson's principal orthopedic surgeon, Dr. Antoni B. Goral, testified as her medical expert. In the days following the fall of August 13 he had noted a progressive loss of fixation of the plate that had been inserted to mend the broken femur sustained in the August 6 fall. In order to correct this condition, that in his opinion was caused by the fall of August 13, revision surgery was required. On August 26 the surgeon entered through the same incision line made in the open

reduction of the broken femur. Dr. Goral moved the existing plate lower, toward the replacement knee, and drilled three new holes for screws. This procedure involved a risk of bursitis, but the risk was unavoidable. Kirson was discharged from Suburban on October 8, 1993.

In February 1994 she was diagnosed with implant related bursitis. In Dr. Goral's opinion the bursitis was caused by dropping the plate down close to the femur prominence which caused soft tissue to rub on the plate. He recommended removal of certain screws from the plate which was done on March 18, 1994. Cultures taken at that time from the site of the surgery were negative for any infection.

In September 1994 Dr. Goral again operated on Kirson to replace the artificial right knee in order to lessen an outward bowing. While removing the artificial knee he found an infection, later identified as a staph epidemitis infection. Dr. Goral could not proceed with inserting a new replacement knee. He filled the knee cavity with antibiotic cement and placed Kirson on a program of antibiotics to clear the infection. When that was accomplished a new replacement knee was inserted on October 24, 1994. Kirson was discharged from the hospital in November. In Dr. Goral's opinion the infection resulted from the operation of March 18, 1994, which was required by the bursitis caused by the August 26, 1993 operation, which, in turn, was necessitated by the August 13, 1993 fall.

Dr. Goral opined that, but for the August 13 fall, Kirson could have returned to work as an operating room nurse in six to nine months after the August 6, 1993 fall, and that a reasonable period of physical therapy for the broken femur suffered on August 6 would have been three months from that date.

Based on this evidence Kirson argued to the jury that damages by way of lost income should be measured from the time when Kirson could have returned to work, had the fall of August 13 not occurred, to the time when she actually did return. Kirson also submitted that her medical expenses

should be measured by the cost of services rendered after August 13, 1993, less the cost of such services that would have been rendered in any event in order to treat the injuries from the fall on August 6.

The action was submitted to the jury on special interrogatories. Instructions to the jury included a direction to find against Suburban if any individual defendant were found to be negligent. The jury found for Kirson against all of the defendants, other than Stephens, and awarded Kirson past medical expenses, past loss of earnings, and non-economic damages totaling $130,500.

The defendants filed a number of post-judgment motions that are relevant to this certiorari review. Suburban, Anderson, and Smith moved for judgment notwithstanding the verdict (JNwV) based on exclusivity. The latter two also sought a JNwV for insufficiency of the evidence. Suburban, joined by Paul, alternatively argued that the verdict should be reduced by the amount paid to Kirson under the Act. The circuit court granted Anderson's JNwV motion and denied all other defense motions. Suburban, Smith, and Paul appealed to the Court of Special Appeals from the judgment against them, and Kirson cross appealed from the judgment in favor of Anderson.

The Court of Special Appeals affirmed as to Suburban, Paul, and Anderson and reversed as to Smith, *i.e.*, Suburban and Paul were liable and Anderson and Smith were not liable. With respect to Suburban's exclusivity defense, the court held that LE § 9–509 applied only to the work-related accidental injury of August 6. *Suburban Hosp.*, 128 Md.App. at 544, 739 A.2d at 881. The court stated that

"Suburban Hospital cannot remotely claim that it was a matter of undisputed fact that the hospital fall of August 13 and all of its sequellae were nothing but an aggravation of the work-related injury of August 6. Except for the logical fallacy of '*Post hoc, ergo propter hoc*,' there was no indica-

tion of any such connection. There was, moreover, extensive evidence to the contrary."

*Id.* at 545, 739 A.2d at 881.

Discussing the dual capacity theory the court principally cited cases from California, Ohio, and Illinois. The court concluded:

"[Suburban] was involved in an employer-employee relationship with Kirson as far as any workers' compensation claim for the August 6 fall was concerned. It was involved in a very different hospital-patient relationship with Kirson as far as the August 13 fall was concerned."

*Id.* at 552, 739 A.2d at 885. The court also rejected Suburban's (and Paul's) "remittitur" argument, reasoning that, under the dual capacity theory, two separate events had occurred and the judgment against Suburban in one capacity could not be reduced by payments made by Suburban in a different capacity. *Id.* at 558–60, 739 A.2d at 888–89.

Reviewing the sufficiency of the evidence as to the negligence of Smith, the Court of Special Appeals concluded that a JNwV should have been granted in her favor. *Id.* at 553–54, 739 A.2d at 885–86. On Kirson's cross appeal, the judgment in favor of Anderson was affirmed. *Id.* at 564–67, 739 A.2d at 892–93. Additional facts with respect to the role of these two nurses will be addressed in Parts V and VI, *infra.*

Suburban petitioned this Court for a writ of certiorari asserting the exclusivity defense and, alternatively, the right to setoff against any judgment the amount of compensation and medicals paid under the Act. Paul has petitioned us asserting that she is entitled to a "remittitur." Kirson has cross petitioned challenging the judgments in favor of Anderson and Smith. We granted all of these petitions.

On the merits Suburban contends that it was obligated under the Act to pay compensation for the injuries flowing from the fall of August 13 because those injuries resulted from malpractice in the treatment of the injury sustained in the August 6 fall. Kirson counters that the rule relied on by Suburban applies only if there is causation in fact and that

there is a dispute of material fact whether the August 13 fall was physically caused by the injuries of August 6.

If Suburban is obligated to pay compensation for injuries resulting from the negligent treatment of a work-related accidental injury, then Suburban contends that it enjoys the exclusivity defense. Kirson, on the other hand, asserts that the dual capacity theory nevertheless permits the tort action.

If Suburban enjoys no exclusivity defense as to injuries resulting from the negligent treatment of the work-related accidental injury of August 6, then Suburban contends that it is entitled to a reduction in the verdict by the amount of compensation and medical benefits that it paid under the Act. Kirson contends that the August 13 fall is a separate accident which does not give rise to a lien or subrogation claim for compensation paid for the August 6 fall. Under our holdings in Parts III and IV.C, *infra*, we do not reach the latter issues.

Finally, Kirson contends that Smith and Anderson were proven to be negligent by legally sufficient evidence.[3]

## II

The question of appellate jurisdiction arises out of the following facts. As amended effective October 1, 1997, Maryland Rule 2–601(a) requires that "[e]ach judgment shall be set forth on a separate document." Where, as here, the action is tried to a jury which renders a special verdict, "the court shall promptly review the form of the judgment presented and, if approved, sign it, and the clerk shall forthwith enter the judgment as approved and signed." *Id.* Accordingly, we

---

**3.** Even though there is no appellate issue concerning the sufficiency of the evidence of negligence on the part of Paul, and even though Suburban does not question its vicarious liability for that negligence, absent an exclusivity defense, Kirson advised the circuit court that the issue of the negligence of Smith or of Anderson was not academic. Kirson represented to the circuit court her concern that Suburban would deny coverage for Paul who was represented throughout by separate counsel.

would expect to find a separate document substantially in the form set forth in the margin, but we do not.[4]

The October 1997 changes to Rule 2–601 were made at the request of this Court to the Rules Committee that the Maryland rule be patterned on Fed.R.Civ.P. 58. The language of Md. Rule 2–602(a), as adopted, is borrowed, with style changes, from Fed.R.Civ.P. 58. *Byrum v. Horning*, 360 Md. 23, 25–26, 756 A.2d 560, 561 (2000). The purpose of the federal rule, according to the notes of the Advisory Committee on the Federal Rules of Civil Procedure, was to eliminate uncertainty as to when a purported entry of judgment was effective. *Id.* at 26–27, 756 A.2d at 561.

The law that has developed in the federal courts under Fed.R.Civ.P. 58 has established clearly that an appellate court, in order to preserve the right of appeal, may consider the separate document requirement to have been waived. *See Bankers Trust Co. v. Mallis*, 435 U.S. 381, 387–88, 98 S.Ct. 1117, 1121, 55 L.Ed.2d 357, 363 (1978) (per curiam). There the action apparently had been dismissed by the district court, but it failed to create " 'any document that look[ed] like a judgment.' " *Id.* at 382, 98 S.Ct. at 1119, 55 L.Ed.2d at 360

---

4. The separate document, beneath the caption of the action, should in substance read:

"Judgment on Jury Verdict

"This action having come on for trial before the Court and a jury, the undersigned judge presiding, and the issues having been duly tried and the jury having duly rendered its special verdict,

"It is Ordered and Adjudged:

"That the plaintiff, Phyllis R. Kirson, recover of the defendants, Suburban Hospital, Inc., Mary Beth Smith, Mary Anderson, and Aparangi Paul, jointly and severally, the sum of $130,500, with interest and costs; and

"That the plaintiff take nothing against the defendant, Carol Stephens, that the action be dismissed on the merits as to said defendant, and that the defendant, Carol Stephens, recover of the plaintiff, Phyllis R. Kirson, her costs.

/s/_____

Judge

/s/_____

(Date)"

The above is patterned on Federal Rules of Civil Procedure, Form 31.

(quoting *Mallis v. Federal Deposit Ins. Corp.*, 568 F.2d 824, 827 n. 4 (2d Cir.1977)). The Supreme Court assumed, without deciding, that the separate document requirement must be met in order for an appellate court to have jurisdiction over the matter. But, the Court continued by stating, "We nonetheless conclude that it could not have been intended that the separate-document requirement of Rule 58 be such a categorical imperative that the parties are not free to waive it." *Id.* at 384, 98 S.Ct. at 1119–20, 55 L.Ed.2d at 361. The Court continued by stating the following:

> "The separate-document requirement was thus intended to avoid the inequities that were inherent when a party appealed from a document or docket entry that appeared to be a final judgment of the district court only to have the appellate court announce later that an earlier document or entry had been the judgment and dismiss the appeal as untimely. The 1963 amendment to Rule 58 made clear that a party need not file a notice of appeal until a separate judgment has been filed and entered. See *United States v. Indrelunas*, 411 U.S. 216, 220–222, 93 S.Ct. 1562, 1564–1565, 36 L.Ed.2d 202, [206] (1973) [ (per curiam) ]. Certainty as to timeliness, however, is not advanced by holding that appellate jurisdiction does not exist absent a separate judgment. If, by error, a separate judgment is not filed before a party appeals, nothing but delay would flow from requiring the court of appeals to dismiss the appeal. Upon dismissal, the district court would simply file and enter the separate judgment, from which a timely appeal would then be taken. Wheels would spin for no practical purpose."

*Id.* at 385, 98 S.Ct. at 1120, 55 L.Ed.2d at 361–62 (footnotes omitted). The Court held that the federal court of appeals properly could proceed with the appeal because the district court clearly evinced its intent that the opinion and order from which the appeal was taken constituted the final decision in the case, a judgment of dismissal was recorded on the clerk's docket, and neither party objected to the taking of the appeal in the absence of a separate document. *Id.* at 387–88, 98 S.Ct. at 1121, 55 L.Ed.2d at 363. Appellate jurisdiction over the

matter existed, and the parties had waived the separate document requirement. *Id.*

The federal courts of appeals uniformly have held that the separate document requirement has been waived where the district court clearly intended its order to be the final judgment in the matter, the appellee has not objected to the failure to comply with the separate document rule, and the clerk of the district court made an entry of judgment on the docket. *See Cooper v. Salomon Bros. Inc.,* 1 F.3d 82, 86 (2d Cir.1993); *Smith v. Massachusetts Dep't of Correction,* 936 F.2d 1390, 1395 (1st Cir.1991); *Sanders v. Clemco Indus.,* 862 F.2d 161, 166–67 (8th Cir.1988); *Simon v. City of Clute,* 825 F.2d 940, 942 (5th Cir.1987); *Vernon v. Heckler,* 811 F.2d 1274, 1276–77 (9th Cir.1987); *Diamond v. McKenzie,* 770 F.2d 225, 231 (D.C.Cir.1985); *Hanson v. Town of Flower Mound,* 679 F.2d 497, 501 (5th Cir.1982).

We hold that the separate document requirement may be waived under Maryland Rule 2–601. Without undertaking to set the outer limits of the availability of waiver of the separate document requirement in order to preserve an appeal in Maryland, we hold that there has been a waiver in the instant matter in which the Circuit Court for Montgomery County clearly intended the docket entries made by that court's clerk, based upon the jury verdict, to be a final judgment and where no party has objected to the absence of a separate document.[5]

This holding was foreshadowed by our decision in *Byrum,* 360 Md. 23, 756 A.2d 560, which presented the converse of the appellate jurisdiction issue present in this case. In *Byrum,* the appellee attempted to use waiver to eliminate the separate document requirement and, thereby, to defeat the appeal by

---

5. Indeed, when the irregularity was brought to the attention of the parties by the Clerk of this Court, they cooperated in attempting to correct the deficiency, first by having the clerk of the Circuit Court for Montgomery County supplement the record with a notice of judgment, which was not signed by the judge, and then by having the trial judge "approve" and sign the special verdict sheet, which was not a judgment.

having a docket entry serve as the entry of judgment so that the notice of appeal would not have been timely filed. *Id.* at 32, 756 A.2d at 564. There we said:

"We need not decide in the instant matter whether *Bankers Trust* has any application under Maryland Rule 2–601 ... inasmuch as *Bankers Trust* is distinguishable from the case at hand. *Bankers Trust* applied what [a respondent] calls 'waiver' *in order to preserve the appeal.* Here, [that respondent] argues waiver in an effort to eliminate the requirement of a separate document and thereby *to defeat the appeal* by having the docket entries of July 15 serve as the entry of judgment. With respect to circumstances analogous to those before us, the Court in *Bankers Trust* expressly reaffirmed the rule of *United States v. Indrelunas,* 411 U.S. 216, 93 S.Ct. 1562, 36 L.Ed.2d 202 (1973) (per curiam), according to which 'the separate-document rule must be "mechanically applied" in determining whether an appeal is timely.' *Bankers Trust,* 435 U.S. at 386, 98 S.Ct. at 1120, 55 L.Ed.2d at 362. Mechanical application of the separate document rule makes the Byrums' appeal timely."

*Id.* at 32, 756 A.2d at 564–65 (emphasis added). Use of the waiver doctrine in the case *sub judice* fits squarely within the rationale of *Bankers Trust* as it preserves the right to appeal where no objection has been made and the trial court clearly intended for the docket entries to constitute a final judgment.

## III

■ It is firmly established in Maryland law that the employer must pay compensation under the Act for the aggravation of a claimant's medical condition due to medical malpractice in the treatment of a workplace injury. *Mackin & Assocs. v. Harris,* 342 Md. 1, 5, 672 A.2d 1110, 1112 (1996) ("[C]omplications flowing directly from treatment of a compensable injury are covered by the Act, even if the complications result from negligent medical treatment."); *Young v. Hartford Accident & Indem. Co.,* 303 Md. 182, 192, 492 A.2d 1270, 1275 (1985); *Sterry v. Bethlehem Steel Corp.,* 64 Md. App. 175, 190–91, 494 A.2d 748, 756 (1985) (Wilner, J., dissent-

ing); *Nazario v. Washington Adventist Hosp., Inc.,* 45 Md. App. 243, 246, 412 A.2d 1271, 1273, *cert. denied,* 288 Md. 740 (1980) ("[I]t is universally held that a [Workers'] Compensation award includes any aggravation of an injury which may have occurred through a physician's or hospital's negligence.").

In the instant matter the undisputed medical evidence is that the August 13 fall aggravated the injury of August 6 in that the later fall loosened the metal plate that had been inserted above Kirson's right knee. This, as described in the testimony of Dr. Goral, caused further aggravations and complications. Under the above cases, the negligent care in the treatment of the August 6 injury makes the subsequent aggravations and complications, under the evidence, compensable under the Act as results of the August 6 accident that arose out of and in the course of Kirson's employment.

Kirson, relying on cases that do not involve medical malpractice in the treatment of a compensable injury, argues that there must be causation in fact between the two accidents for the later one to be compensable. For example, in *Mackin* the claimant had suffered a compensable injury while in the employ of the respondent, but had left that employment by the time of a second accident that formed the basis for the compensation claim that was the subject of the reported case. The second accident occurred when the claimant slipped on ice and fell while walking to get a physical therapy treatment for the original injury. We held that there was "no legally sufficient nexus between the claimant's occupational injury in 1989 and his subsequent fall in 1993." *Mackin,* 342 Md. at 11, 672 A.2d at 1115. We announced "general agreement with the basic rule advocated by Professor Larson [1 Larson, *The Law of Workmen's Compensation* § 13.13 nn. 41–47 (1993) ]—that a subsequent injury is compensable if it is the direct and material result of a compensable primary injury." *Id.* at 7, 672 A.2d at 1113. *See also Unger & Mahon, Inc. v. Lidston,* 177 Md. 265, 268, 9 A.2d 604, 605–06 (1939) (jury question presented as to whether sharp pain in ankle, previously in-

jured at work, caused claimant to fall from outside steps at home, resulting in broken hip).

In cases involving negligent medical treatment, however, in order for the subsequent injury to be compensable, it is necessary only to show that the injury directly resulted from improper treatment of the original compensable injury. In order to recover compensation for the subsequent injury, it is not necessary, as Kirson contends, to split causation hairs. *See Radermecher v. FMC Corp.*, 375 N.W.2d 809, 812 (Minn. 1985) (malignant melanomas compensable where causally related to prolonged exposure to ultraviolet light used in treatment of dermatitis resulting from working with hot wax vapors in chrome plating process); *Shoemaker v. Workmen's Compensation Appeal Bd.*, 145 Pa.Cmwlth. 667, 604 A.2d 1145, 1146 (1992) (AIDS compensable where substantial evidence supported finding that it resulted from blood transfusions received during surgery in treatment of fractured pelvis, knee, and left leg incurred in work-related motor vehicle accident); *American Filtrona Co. v. Hanford*, 16 Va.App. 159, 428 S.E.2d 511, 513 (1993) (hepatitis compensable if resulted from a blood transfusion necessitated by industrial accident). Kirson's medical malpractice injury is sufficiently connected to the original compensable injury because the medical malpractice injury arose during the course of treatment of the original compensable injury.[6]

---

**6.** Kirson makes three additional submissions designed to prevent review in this case of the question of law concerning the dual capacity theory. First, she contends that employer's immunity should have been pleaded specially, but it is not an affirmative defense enumerated in Md. Rule 2–323(g). *See Ben Lewis Plumbing, Heating & Air Conditioning, Inc. v. Liberty Mut. Ins. Co.*, 354 Md. 452, 463–67, 731 A.2d 904, 911–13 (1999).

Kirson also contends that counsel for Suburban waived the employer's immunity at a hearing on a discovery dispute held when Kirson was attempting to identify potential defendants in order to amend the complaint before the statute of limitations had run. In colloquy with the court Suburban's counsel said: "I mean, there are people who had various layers of responsibility. To the extent that, of those people [who] were negligent, we will stipulate that Suburban Hospital was liable for their negligence." In context, the statement cannot be related

## IV.

### A

We turn then to whether the theory of dual capacity, as described and applied by the Court of Special Appeals, should be embraced as part of Maryland law. The subject of "dual capacity" seemingly is best to be approached by a survey of the legal landscape as seen through the eyes of the authors of 1 A. Larson, *Larson's Workers' Compensation Law,* Chs. 112 and 113 (2000 ed.) (Larson). Larson rejects the dual capacity theory, *eo nomine,* because it has come to mean a single legal person acting in different capacities so that "a few courts have stretched the doctrine so far as to destroy employer immunity whenever there was, not a separate legal person, but merely a separate relationship or theory of liability." Larson § 113.01[2], at 113–2. Larson states:

> "When one considers how many such added relations an employer might have in the course of a day's work—as landowner, land occupier, products manufacturer, installer, modifier, vendor, bailor, repairman, vehicle owner, shipowner, *doctor, hospital, health services provider,* self-insurer, safety inspector—it is plain enough that this trend could go a long way toward demolishing the exclusive remedy principle."

*Id.* (emphasis added).

To describe when immunity properly is not available Larson substitutes the term "dual persona."

> "The choice of the term 'persona' . . . is dictated by the literal language of the typical third-party statute, which usually defines a third party, in the first instance, as 'a

to employer's immunity and there is no voluntary waiver of a known right. Indeed, the circuit court instructed the jury that Suburban would be vicariously liable if the jury found any of the individual employee defendants liable.

Kirson's remaining preliminary contention is that Suburban did not seek to have employer immunity submitted to the jury. The contention is patently frivolous. The circuit court made plain, as reviewed in Part I, *supra,* that the exclusivity defense did not involve the jury.

person other than the employer.' This is quite different from 'a person acting in a capacity other than that of employer.' The question is not one of activity or relationship—it is one of identity. The Tennessee Supreme Court [*McAlister v. Methodist Hosp. of Memphis*, 550 S.W.2d 240, 246 (Tenn.1977) ], brushing aside all the fictitious sophistry of 'dual capacity,' nailed down this point with breathtaking simplicity.

" 'The employer is the employer; not some person other than the employer. It is as simple as that.' "

*Id.* at 113–3 (footnotes omitted). Illustrative of separate legal persons are (1) a natural person as an individual and that same person as a trustee or guardian and (2) a natural person as 100% owner of a corporation and the corporation. Larson § 113.01[2]-[3], at 113–4 to 113–6.

The line which the authors would draw to avoid the slippery slope of dual capacity is based on duty.

"If the dual persona doctrine is to apply, it must be possible to say that the duty arose *solely* from the *nonemployer* persona, rather than the other way around. For only in such a case can the second persona be really distinct from the employer persona. In other words, it is not enough ... that the second persona impose *additional* duties. They must be totally separate from and unrelated to those of the employment."

Larson § 113.01[4], at 113–10.

Another exception to the exclusivity of workers' compensation arises where there is a single person involved in two unrelated transactions with the employee. Larson calls this the "dual transaction" doctrine. Larson § 113.08, at 113–24.1 to 113–26. One illustration is that of the plaintiff who is a clerk in the defendant's store. On a day when the clerk is not working but is shopping in the store, the clerk is injured by the negligence of the clerk on duty. Larson considers that a tort action against the employer is maintainable. *Id.* at 113–25.

The authors also posit the following as a second example:

"[S]uppose a nurse who works for the defendant hospital happens to be involved in a weekend accident while driving past the hospital, and is rushed to [the] hospital's emergency room, where the alleged malpractice occurs. Here again, no one would contend that her suit is barred.

"The facts are not always this clear, but the commonest example of this distinction is that involving an employer who undertakes to treat an employee as a private patient. When the case involves a purely private relation with no employment involvement, suit is usually not barred.

"The fact that the nonoccupational illness manifests itself during working hours does not necessarily change the result, if it is clear, as it was in the Pennsylvania case of *Tatrai* [*v. Presbyterian Univ. Hosp.*, 497 Pa. 247, 439 A.2d 1162 (1982) ] that the employee is being treated on exactly the same terms as any member of the public and is expected to pay in the same way for the service. . . .

"All [of] this presupposes the complete absence of any employer involvement beyond the treatment that would have been given to any member of the public. If, for example, it is the employer's policy to provide first aid or other care for even nonoccupational illnesses appearing during the workday, the result may be different."

Larson § 113.08, at 113–25 (footnotes omitted).

Within the confines of the arguments made to us, "dual capacity," "dual persona," and "dual transactions" cover the spectrum of theories which would avoid the exclusivity defense. The facts of the instant matter do not fall within either of Larson's examples of dual transactions because Kirson suffered an accidental injury at work. Thus, the questions presented, in the terminology employed by Larson, is whether this Court should adopt the dual capacity theory, as described by the Court of Special Appeals, and, if we do not do so, whether the facts of this case satisfy the dual persona test proposed by Larson, namely, whether the duty violated by the employer which forms the basis for the third-party action is

"totally separate from and unrelated to those of the employment." Larson § 113.01[3]-[4], at 113–10.

## B

In cases in which compensation exclusivity has been asserted by a health care provider in defense of a tort suit seeking damages for aggravation of a compensable injury, the decisions roughly fall into three classes. One group applies the dual capacity theory, and a second group applies the defense. The third class, represented by New York cases, splits the baby, allowing recovery against an employer who provides health services to the general public but barring separate actions where the aggravating injury is caused in a health program open only to employees.

## 1

The seminal case applying dual capacity, *Duprey v. Shane,* 39 Cal.2d 781, 249 P.2d 8 (1952), was relied upon by the Court of Special Appeals. *Suburban Hosp.,* 128 Md.App. at 548, 739 A.2d at 883. The California court permitted an employee of a chiropractor to bring a malpractice action against her employer whose treatment aggravated the original compensable injury. *Duprey,* 249 P.2d at 11–13. Set forth below is the California Supreme Court's rationale:

"It is our conclusion that when the employing doctor elected to treat the industrial injury, the doctor assumed the responsibilities that any doctor would have assumed had he been called in on the case. As will be pointed out, such third party doctor can be sued for malpractice resulting in an aggravation of an industrial injury, or a new injury. It follows that the employer-doctor may be sued for malpractice when he elects to treat the industrial injury....

"It is equally true, and admitted by all here concerned, that, in tort cases generally, when a person is injured by a tortious act and this injury is aggravated by the negligence of the attending physician, such aggravation of the injury is within the scope of the risk created by the original tortious act. This rule applies to workmen's compensation cases."

*Id.* at 13 (citations omitted). That court said that the doctor had a "dual legal personality," that of a doctor and that of an employer. *Id.* at 15.

In *D'Angona v. County of Los Angeles*, 27 Cal.3d 661, 166 Cal.Rptr. 177, 613 P.2d 238 (1980) (in bank), recovery in tort against the employer-hospital was allowed for negligent aggravation of a work-related disease. *D'Angona*, 166 Cal.Rptr. 177, 613 P.2d at 242–44. The court stated:

> "In treating plaintiff's disease the county owed her a duty separate and distinct from its duty as her employer, and this was the duty to provide medical care free of negligence—the same duty that it owes to any member of the public who becomes a patient at its hospital. The fact that the county allegedly breached this obligation by employing negligent doctors rather than by some other purportedly negligent act did not absolve it of its responsibility to assure that the medical care which it directly undertook to provide was performed without negligence."

*Id.* 166 Cal.Rptr. 177, 613 P.2d at 243–44.[7]

*D'Angona* is one of the decisions by the Supreme Court of California in which, according to Larson, that court "did much

---

**7.** The continued viability of the dual capacity doctrine has come into question in California since the enactment of Cal.Lab.Code § 3602 (West 1989 & Supp.2000) which is aimed at limiting or prohibiting the use of dual capacity to avoid exclusivity. Since enactment of the statute, the results reached in workers' compensation cases before California's intermediate appellate courts have been inconsistent. *Compare Lake v. Lakewood Chiropractic Ctr.*, 20 Cal.App.4th 47, 24 Cal.Rptr.2d 358, 361–62 (1993) (stating that § 3602 applied to bar the malpractice case against the employer but actually holding that the doctrines of res judicata and election of remedies prevented plaintiff from pursuing a medical malpractice action against her employer after she already received workers' compensation benefits for the injury) *with Sturtevant v. County of Monterey*, 228 Cal.App.3d 758, 279 Cal. Rptr. 161, 164–67 (1991) (holding that § 3602 applies where the employer manufactures a product sold to the public that injures an employee but holding that the legislature did not intend to bar use of the dual capacity theory in medical malpractice cases brought against an employer) and *Weinstein v. St. Mary's Med. Ctr.*, 58 Cal.App.4th 1223, 68 Cal.Rptr.2d 461, 465–66 (1997) (invoking dual capacity to allow premises liability suit by hospital employee against employer).

more than its share to extend the dual capacity doctrine beyond all justifiable limits." Larson § 112.02[1][c], at 112–10 (footnote omitted). Those authors submit that exclusivity applied with even greater force in *D'Angona* than in *Duprey* because of the crucial difference described below.

"The duty to the employee which the employer violated by allegedly furnishing a negligent doctor was not the duty of doctor to patient, but the duty of *employer* to employee to furnish proper medical care. The *persona* that employed the plaintiff is the same legal persona that owed plaintiff the duty to supply proper medical services. Again, there is simply no way two legal persons can be constructed out of one employer in this situation."

Larson § 112.02[1][c], at 112–11.

Larson identifies Ohio with California as the "only two states" in which dual capacity has "flourished." Larson § 113.01[4], at 113–6. Ohio adopted the rationale of the California cases in *Guy v. Arthur H. Thomas Co.,* 55 Ohio St.2d 183, 378 N.E.2d 488, 492 (1978). In doing so, the Ohio Supreme Court stated, "We find no compelling reason why an action [for malpractice] should be less viable merely because the traditional obligations and duties of the tortfeasor [hospital] spring from the extra-relational capacity of the employer, rather than a third party." *Arthur H. Thomas Co.,* 378 N.E.2d at 492. Since that decision, the Ohio court has declined to apply dual capacity in other contexts. *See Freese v. Consolidated Rail Corp.,* 4 Ohio St.3d 5, 445 N.E.2d 1110, 1114–15 (1983) (city police officer, injured while performing his duties as a motorcycle officer which required him to travel the city's streets, barred from suing city in tort for failing to keep streets in proper repair); *Bakonyi v. Ralston Purina Co.,* 17 Ohio St.3d 154, 478 N.E.2d 241, 244 (1985) (holding employee's strict liability action against employer for workplace injury was barred by the exclusivity provision of Ohio's Workers' Compensation Act).

Courts in several other jurisdictions have applied the dual capacity theory in medical malpractice cases. In *Wright v. District Court for the County of Jefferson,* 661 P.2d 1167

(Colo.1983) (en banc), the Colorado Supreme Court disallowed co-employee immunity under the Colorado workers' compensation act in a suit against a doctor who was employed by Adolph Coors Company to render medical services to employees. The Colorado court reasoned that the statute did not require Coors to maintain a clinic. "When an employer voluntarily undertakes to directly render medical treatment to its injured employees, it assumes a function which is not required by the Act and, what is most significant, which is not an integral part of its business." *Id.* at 1169. *See also Tatum v. Medical Univ. of South Carolina,* 335 S.C. 499, 517 S.E.2d 706, 712 (S.C.App.), *cert. granted* (S.C. Nov. 5, 1999) (concluding that the "secondary" relationship of hospital and patient " 'created obligations to the employee independent of its obligations as employer,' and the secondary relationship was so 'completely independent as to create a separate legal person' "); *Dalton v. Community Gen. Hosp.,* 275 Ill.App.3d 73, 211 Ill.Dec. 433, 655 N.E.2d 462, 465, *cert. denied* (Ill. Oct. 13, 1995) ("In this second capacity as a medical provider [treating a compensable injury], the hospital's duties were unrelated to those obligations flowing from its role as plaintiff's employer"). *But see Mufich v. Heisler Green Chem. Co.,* 121 Ill.App.3d 958, 77 Ill.Dec. 426, 460 N.E.2d 482 (1984), discussed *infra;* and see *Weber v. Armco, Inc.,* 663 P.2d 1221, 1226 n. 16 (Okla.1983) (citing *Duprey v. Shane, supra,* as a case where dual-capacity was appropriately applied but refusing to apply that theory to permit the product liability suit before it).

*Jefferson Med. College Hosp. v. Savage,* 7 Pa.Cmwlth. 35, 298 A.2d 694 (1972), may be viewed as applying the dual capacity theory, although the decision is equally explainable as one drawing a distinction between the original and the subsequent injuries. There, the work-related injury was a fracture of the left hip. While the claimant was a patient in the employer's hospital, her left hip was dislocated from the socket, on two occasions, due to the negligence of hospital employees. On each occasion the fracture was not damaged, and it healed completely. The dislocations "were new and independent injuries" that did not occur in the course of employment. *Savage,* 298 A.2d at 696. The Commonwealth

Court viewed the outcome as a natural extension of *Tatrai*, 497 Pa. 247, 439 A.2d 1162, in which the Supreme Court of Pennsylvania permitted an employee to sue her employer, a hospital, for injuries she sustained as a patient while being treated in the employer's emergency room for a *non-work related* illness that manifested itself during the employee's normal working hours. *Id.* at 1163.

### 2

The apparent numerical weight of authority among jurisdictions considering the problem holds that a compensation act provides the exclusive remedy for the aggravation of a compensable injury by the medical malpractice of a co-employee. Typically, the compensation act in the cases reviewed below confers immunity on co-employees as well as on employers.

A review of the law concerning the dual capacity theory in a medical malpractice context was recently undertaken by the Texas Supreme Court. *Payne v. Galen Hosp. Corp.*, 28 S.W.3d 15 (Tex.2000). In that case the hospital's pharmacy had negligently filled prescriptions for medication to treat the work-related back pain of a nurse who was continuing to work and who was not a patient admitted to the hospital. *Id.* at 16–17. The pharmacy did not dispense prescriptions to the general public, nor to hospital employees, unless they had been injured on the job. Under those facts the court held that dual capacity could not apply. The court concluded that "[d]rugs prescribed for on-the-job injuries are considered part of an employee's treatment under the Act" so that compensation was the exclusive remedy. *Id.* at 18. In a footnote supported by many citations, and after stating that the intermediate appellate courts in Texas had rejected dual capacity, the court observed:

> "The majority of other jurisdictions considering the dual-capacity doctrine have rejected it as well. Most states have simply rejected the dual-capacity doctrine outright."

*Id.* at 20 n. 4.

A leading case sustaining the exclusivity defense is *McAlister v. Methodist Hosp. of Memphis*, 550 S.W.2d 240 (Tenn.

1977). There the employee argued that the hospital acted in two capacities: "as an employer and as a hospital," and that, had she been treated at another hospital, she could have maintained a tort action. *Id.* at 243. The Tennessee Supreme Court held that, as a matter of law, the initial compensable injury is the cause of any aggravation or additional injuries received during the course of treating the original compensable injury. *Id.* at 245. The court succinctly stated:

> "Nothing in [the Tennessee act] may be construed to evince a legislative intent that an employer may ever be classified as a 'third person,' without doing violence to the plain language which permits common law suits against 'some person other than the employer.' *The employer is the employer, not some person other than the employer.* It is that simple. The injured workman is confined to the benefits provided by the Workmen's Compensation Act and may not sue his employer in tort."

*Id.* at 246 (emphasis added).

In *Mufich,* 77 Ill.Dec. 426, 460 N.E.2d 482, an Illinois intermediate appellate court gave the following explanation for applying the exclusivity defense.

> "In the case at bar, [the hospital] was only fulfilling the statutory requirement that it had as an employer to provide and pay for medical services which are necessary in case of an industrial accident. It was acting in its capacity as employer rather than in an unrelated capacity. The fortuitous circumstance that it was itself a hospital with complete medical facilities cannot change that fact. To require it, in order to be protected by the exclusive remedy provision of the Compensation Act, to set up a separate facility or to hire doctors to render medical attention to its employees injured in the course of their employment, would be to require it to do something it was already equipped to do without those unnecessary steps."

*Id.* 77 Ill.Dec. 426, 460 N.E.2d at 485.

Cases from other jurisdictions that have specifically refused to apply the dual capacity doctrine to claims of employer

medical malpractice in the treatment of work-related injury include: *Lindsay v. George Washington Univ.,* 279 F.2d 819, 820–21 (D.C.Cir.1960) (negligent injection of a tetanus antitoxin; employer-hospital immune because compensation obligation extended to all "legitimate" consequences of original injury); *Diaz v. Magma Copper Co.,* 190 Ariz. 544, 950 P.2d 1165, 1173 (App.1997) (negligent first aid treatment of mine worker; federal and state laws required the employer to provide emergency medical assistance to injured employees); *Panaro v. Electrolux Corp.,* 208 Conn. 589, 545 A.2d 1086, 1087–88 (1988) (negligence of full-time company nurse in treating compensable stroke suffered by employee at work; creation of exception to co-employee immunity rejected); *Ray v. District of Columbia,* 535 A.2d 868, 871 (D.C.1987) (negligence of physicians employed by administrative board in treatment of service connected injury compensable under police officers and firefighters disability act; applying *Lindsay,* 279 F.2d 819); *Warwick v. Hudson Pulp & Paper Co.,* 303 So.2d 701, 702 (Fla.Dist.Ct.App.1974), *cert. denied,* 314 So.2d 776 (1975) (negligence by company nurse at employer's clinic; recognizing employer liable for compensation for aggravation and applying tradeoff of immunity for no fault compensation); *McCormick v. Caterpillar Tractor Co.,* 85 Ill.2d 352, 53 Ill.Dec. 207, 423 N.E.2d 876, 877–79 (1981) (negligence by company doctors in performing duty imposed on employer by compensation statute; that employer used employees and not independent contractors to carry out duty did not alter fact that medical services were rendered in its capacity as an employer); *Trotter v. Litton Sys.,* 370 So.2d 244, 247 (Miss.1979) (negligence of attendant at first aid station; agreeing with analysis of Tennessee court in *McAlister,* 550 S.W.2d 240); *Burns v. Employer Health Servs.,* 976 S.W.2d 639, 643 (Mo.Ct. App.1998) (negligent selection of the type of treatment by independent agent engaged by employer to manage medical aspects of compensation claims; reasoning that selection was part of employer's duty to provide care reasonably required); *Deller v. Naymick,* 176 W.Va. 108, 342 S.E.2d 73, 78 (1985)

(applying plain language of statute in holding that full-time company doctor has only one capacity).

In addition to the preceding cases, which reject the dual capacity doctrine in the specific context of medical malpractice actions, the majority of jurisdictions have flatly refused to apply the dual capacity doctrine in a variety of other factual contexts.[8]

**8.** *Ritchie v. Bridgestone/Firestone, Inc.*, 621 So.2d 288, 289 (Ala.1993) (products liability suit barred by exclusivity provision); *State v. Purdy*, 601 P.2d 258, 260 (Alaska 1979) (rejecting dual capacity exception for state's alleged failure to properly maintain highway and expressing concern that the dual capacity exception would extensively undermine the workers' compensation scheme because of the endlessly imaginable situations in which it could be used to avoid the exclusivity provision); Ark.Code Ann. § 11–9–105 (Lexis 1996) (rejecting dual capacity by statute); Cal.Lab.Code § 3602 (West 1989 & Supp.2000) (same); *Dugger v. Miller Brewing Co.*, 199 Ga.App. 850, 406 S.E.2d 484, 487 (1991) (reiterating Georgia's rejection of the dual capacity doctrine); *Estate of Coates v. Pacific Eng'g*, 71 Haw. 358, 791 P.2d 1257, 1260 (1990) (stating that "[t]here are sound social and economic policy reasons which support the exclusivity of the Workers' Compensation Act, and it remains for the legislature to reexamine those reasons in light of contemporary circumstances and to amend the Act if it chooses to do so"); *Rhodes v. Sunshine Mining Co.*, 113 Idaho 162, 742 P.2d 417, 423 (1987) (rejecting dual capacity doctrine); *Needham v. Fred's Frozen Foods, Inc.*, 171 Ind.App. 671, 359 N.E.2d 544, 545 (1977) (products liability claim barred by exclusivity provision); *Borman v. Interlake, Inc.*, 623 S.W.2d 912, 913 (Ky.Ct.App.1981) (exclusivity provisions barred products liability claim against employer); La.Rev.Stat. Ann. § 23:1032 (West 2000) (rejecting dual capacity doctrine by statute); *Longever v. Revere Copper & Brass Inc.*, 381 Mass. 221, 408 N.E.2d 857, 859–60 (1980) (rejecting products liability claim against employer and stating that implicit in the dual capacity argument is a dissatisfaction with the workers' compensation scheme which is properly addressed to the legislature and not the courts); *Herron v. Pack & Co.*, 217 Mont. 429, 705 P.2d 587, 588–89 (1985) (holding employee's sole remedy for injuries resulting from employer's failure to properly maintain vehicle's braking system was under the workers' compensation law); *Pendergrass v. Card Care Inc.*, 333 N.C. 233, 424 S.E.2d 391, 395 (1993) (stating dual capacity doctrine might exist in North Carolina but refusing to apply dual capacity doctrine on facts before court); *Quinn v. National Gypsum Co.*, 124 N.H. 418, 469 A.2d 1368, 1369–70 (1983) (per curiam) (rejecting products liability claim against employer); *Schlenk v. Aerial Contractors, Inc.*, 268 N.W.2d 466, 474 (N.D.1978) (stating "the North Dakota Workmen's Compensation Act does not permit the application of the dual capacity theory"); *VerBouwens v. Hamm Wood Prods.*, 334 N.W.2d 874, 876 (S.D.1983) (refusing to apply dual capacity theory

3

The New York cases distinguish between a health clinic open solely to employees and one furnishing health services to the general public. In the former context, an employee's exclusive remedy for medical malpractice is compensation, *see Garcia v. Iserson*, 33 N.Y.2d 421, 353 N.Y.S.2d 955, 309 N.E.2d 420, 422 (1974), while in the latter context a tort action lies. *See Milashouskas v. Mercy Hosp.*, 64 A.D.2d 978, 408 N.Y.S.2d 808, 809 (1978). The following quote summarizes the New York distinction:

"Where an employee of a hospital is admitted as a patient [to treat an injury compensable under the workers' compensation law], and is negligently treated at that hospital, the injuries which result have been held not to arise out of the injured person's employment, so that an action at law to recover for such injuries may be brought (*see Sivertsen v. State of New York*, 19 N.Y.2d 698, 278 N.Y.S.2d 886, 225 N.E.2d 572[, 573 (1967) ]; *Volk v. City of New York*, 284 N.Y. 279, 30 N.E.2d 596[, 597 (1940) ]; *Milashouskas v. Mercy Hosp.*, 64 A.D.2d 978, 408 N.Y.S.2d 808[, 809 (1978) ]; *Stevens v. County of Nassau*, 56 A.D.2d 866, 392 N.Y.S.2d 332[, 333 (1977) ] ). These cases are to be distinguished from those in which malpractice is committed by a coemployee of the plaintiff, and where the medical services rendered by that coemployee were not available to the public, but were exclusively available to coemployees, so that a nexus exists between the plaintiff's employment and the occurrence of the malpractice (*see, Golini v. Nachtigall*, 38 N.Y.2d 745, 381 N.Y.S.2d 45, 343 N.E.2d 762[, 763 (1975), overruled, in part, by *Botwinick v. Ogden*, 59 N.Y.2d 909, 466 N.Y.S.2d 291, 453 N.E.2d 520 (1983)]; *Garcia v. Iserson*, 33 N.Y.2d 421, 353 N.Y.S.2d 955, 309 N.E.2d 420[, 422 (1974)])."

against employer as the designer and manufacturer of an allegedly dangerous saw); *Hunsaker v. State,* 870 P.2d 893, 899 (Utah 1993) (refusing to apply dual capacity but stating it is a possibility that some form of the dual capacity doctrine might be able to coexist with the Utah workers' compensation scheme).

*Firestein v. Kingsbrook Jewish Med. Ctr.,* 137 A.D.2d 34, 528 N.Y.S.2d 85, 88 (1988).

It appears that Pennsylvania law, as it has evolved, makes the same distinction. *Compare Tatrai,* 439 A.2d at 1166 (applying California rationale of duty to public where employee's injury was not work related) *with Budzichowski v. Bell Telephone Co.,* 503 Pa. 160, 469 A.2d 111, 115 (1983) (holding employer immune from suit for negligent treatment of compensable injury received at employer's medical dispensary, a facility not open to the general public), *and Snyder v. Pocono Med. Ctr.,* 440 Pa.Super. 606, 656 A.2d 534, 536–38 (1995), *aff'd by an equally divided court,* 547 Pa. 415, 690 A.2d 1152 (1997) (holding that tort suit against employer hospital was barred by exclusivity provisions of the workers' compensation act where nurse, as part of hospital's employee health program, failed to diagnose plaintiff's tuberculosis).

## C

■ For the reasons set forth below, dual capacity is not compatible with Maryland law. Accordingly, we hold that the exclusivity defense applies to Suburban in the case at hand.

The dual capacity theory cannot be applied under the Act without doing considerable violence to the language employed by the General Assembly. LE § 9–509 states: "Except as otherwise provided in this title, the compensation provided under this title to a covered employee ... is in place of any right of action against any person." The only exceptions in the Labor and Employment title permitting a right of action against the employer deal with the failure to secure compensation, LE § 9–509(c), and deliberate acts by the employer. LE § 9–509(d).

A further statutory exception to the rule in LE § 9–509(b) under which compensation "is in place of any right of action against any person" is the authorization for third-party actions in LE § 9–901. It reads: "When a person *other than an employer* is liable for the injury ... of a covered employee for which compensation is payable under this title, the covered

employee ... may ... bring an action for damages against the person liable for the injury." (Emphasis added). Here, Kirson asserts a third-party claim against Suburban, but Suburban is not a "person other than" Suburban.

As we explained in *Knoche v. Cox,* 282 Md. 447, 385 A.2d 1179 (1978):

> "This Court, long past and to the present day, has uniformly said that, aside from the exceptions created by the Act itself, the operation of the law is exclusive of all other remedy and liability, as to both the employer and employee who come within the purview of the Act, with respect to all injury arising out of and in the course of employment."

*Id.* at 452–53, 385 A.2d at 1181–82. *See also Great Atl. & Pac. Tea Co. v. Imbraguglio,* 346 Md. 573, 582, 697 A.2d 885, 889 (1997); *Brady v. Ralph Parsons Co.,* 308 Md. 486, 498, 520 A.2d 717, 726 (1987).

Further, even if we assume that Larson's "dual persona" theory is available under the Act, that theory is not available under the facts of this case. For the dual persona theory to apply "it must be possible to say that the duty arose *solely* from the *nonemployer* persona." Larson § 113.01[4], at 113–10. The duties of the second persona "must be totally separate from and unrelated to those of the employment." *Id.* Here Suburban's duties to Kirson as the provider of medical services in treatment of the injuries sustained in the work-related fall of August 6, 1993, are not totally separate from Suburban's duties as employer.

Section 9–660 of the Act imposes a duty upon employers to provide medical services to an employee who has suffered an accidental personal injury. The statute in relevant part reads:

> "(a) *In general.*—In addition to the compensation provided under this subtitle, if a covered employee has suffered an accidental personal injury ... the employer or its insurer promptly shall provide to the covered employee, as the Commission may require:
>
> "(1) medical, surgical, or other attendance or treatment;

"(2) hospital and nursing services;

"(3) medicine;

"(4) crutches and other apparatus; and

"(5) artificial arms, feet, hands, and legs and other prosthetic devices."

Consequently, when Kirson suffered an aggravation of the injury of August 6 due to negligence of one or more co-employees of Kirson, those co-employees were performing Suburban's duty to "provide to the covered employee ... hospital and nursing services." Thus, Suburban was not acting as a person totally separate from the employer when it was providing the hospital and nursing services on August 13, and Suburban continued to enjoy the exclusivity defense.

Reinforcing the construction of the Act set forth above is LE § 9–902. It confers on, *inter alia,* a self-insured employer, the right, exercisable within two months after the Commission makes an award, to bring an "action for damages against the third party who is liable for the injury or death of the covered employee." LE § 9–902(a). In the case of a self-insured employer, such as Suburban, the dual capacity theory, under which Suburban would be considered to be a third party, encounters the anomaly of the General Assembly's having authorized Suburban to sue itself, initially to the exclusion of any suit by Kirson.

Applying the dual capacity theory under the facts of this case is also inconsistent with the manner in which this Court has applied employer's immunity. In *Flood v. Merchants Mut. Ins. Co.,* 230 Md. 373, 187 A.2d 320 (1963), the employee brought a tort action against the workers' compensation insurer of the employer on the theory that the insurer had been negligent in the selection of a physician whose negligence had exacerbated the claimant's original work-related injury. We held that, under those circumstances, the insurer enjoyed the exclusivity defense provided to the employer by the Act. *Id.* at 379, 187 A.2d at 323. *See also Great Atl. & Pac. Tea Co.,* 346 Md. at 587, 697 A.2d at 892. Similar to *Flood* is *Young v. Hartford Accident & Indem. Co.,* 303 Md. 182, 492 A.2d 1270

(1985). The claimant-plaintiff in *Young* alleged that her emotional disability, which included an attempted suicide, had been negligently caused by the compensation insurer's insistence on an independent psychiatric examination when the insurer was on notice that such an examination would be highly detrimental to the claimant's condition. We held that the complaint failed to allege a claim because its legal sufficiency was controlled by *Flood.* *Id.* at 193, 492 A.2d at 1275–76.

Thus, the Maryland cases have in some circumstances expanded the immunity beyond the employer and certain co-employees. See Part V.B, *infra.* Kirson, on the other hand, seeks to withdraw immunity from the employer itself by having this Court adopt the dual capacity theory. Adopting that theory would require overruling the *Flood* and *Young* cases. Indeed, were we to adopt the dual capacity theory and hold that, as to the August 13 accident, Suburban and Kirson were hospital and patient and no longer employer and employee, then we know of no principled basis on which to limit dual capacity to the provision of health care services. Adoption of dual capacity here would seem inexorably to lead to the abolition of the employer's immunity in product and premises liability cases.

Fundamentally, Kirson's argument attacks the social contract on which workers' compensation is based. Suburban is obliged to pay compensation by way of disability benefits and medical expenses for the injuries sustained on August 6 and for the injuries resulting from malpractice in the treatment of the August 6 injuries. See Part III, *supra.* Having received compensation, Kirson wants the right to sue Suburban to recover damages which, hopefully from the plaintiff's standpoint, would exceed the amount of compensation paid. We hold, however, that, in exchange for the imposition of no fault limited liability for workplace accidents, Suburban bought peace from being considered as a third party when rendering hospital services to Kirson in fulfillment of its obligation under the Act to "provide" medical care. LE § 9–660(a).

## D

The factual predicate of the foregoing holding is Suburban's proffer concerning compensation payments made by it or for its benefit. Kirson has raised questions concerning details of the evidence proffered. Those questions were not addressed by the trial court in light of its ultimate legal ruling that employer immunity did not apply. Those questions, however, may not have any continued practical relevance in view of our holding in Part V, *infra,* that there was sufficient evidence to take the claim against Smith to the jury. Nevertheless, in order to give Kirson an opportunity to be heard, we shall remand as to Suburban for further proceedings, consistent with this opinion, including, particularly, consistency with the causation holding in Part III, *supra.*

## V

## A

■ Kirson contends that the Court of Special Appeals erred in concluding that Smith's JNwV motion should have been granted. We find that there was sufficient evidence of negligence on the part of Smith to submit the claim against her to the jury. When one cuts through the conflicting evidence and recognizes that impeaching evidence was for the jury to evaluate, the evidence most favorable to Kirson is found in her testimony and that of Dr. Goral.

Smith is a registered nurse to whom Kirson had been assigned for patient care for the first time on August 13, 1993. Paul was a patient care technician. The latter perform basic nursing tasks which are assigned to them by the RNs. Illustrative of these tasks are taking vital signs, helping to feed patients, helping to transfer patients, ambulating patients, toileting patients, and providing for their baths and their oral hygiene. That morning Smith and Paul assisted Kirson to the commode, and both would have heard Kirson's complaints of

lightheadedness.[9] Dr. Goral opined that Smith deviated from the standard of care by failing properly to supervise Paul. He recognized that it would be an inefficient use of personnel for Smith to be present in Kirson's room during the entire period while Kirson was using the commode. It was his opinion, however, that Smith, as the more senior person, should have instructed Paul that the patient needed two-person assistance on the return transfer from the commode to the bed, inasmuch as two persons "had to get her up standing out of bed initially."

Accordingly, our mandate will reinstate the judgment against Smith.

## B

Smith alternatively asserts that she enjoys the same immunity that applies to Suburban. Although this alternative defense was not raised by a cross petition for certiorari, we shall exercise our discretion under Md. Rule 8–131(a) to consider it in this Court, inasmuch as the issue has been briefed and argued here, and our direct consideration of the defense will eliminate the necessity for a remand to the Court of Special Appeals where the issue was raised but not decided.

In Maryland, a co-employee, as such, does not partake of the employer's immunity under the Act. *See Hastings v. Mechalske,* 336 Md. 663, 673, 650 A.2d 274, 279 (1994); *Bishop v. Twiford,* 317 Md. 170, 171, 562 A.2d 1238, 1239 (1989); *Athas v. Hill,* 300 Md. 133, 137, 476 A.2d 710, 712 (1984); *Hauch v. Connor,* 295 Md. 120, 121, 453 A.2d 1207, 1208 (1983); *Leonard v. Sav–A–Stop Servs., Inc.,* 289 Md. 204, 208, 424 A.2d 336, 337 (1981); *Hutzell v. Boyer,* 252 Md. 227, 232, 249 A.2d 449, 452 (1969). There are, however, certain circumstances under which a supervisory co-employee is not

---

9. Smith testified that she had no recollection of assisting Kirson to get out of bed, but admitted that it was possible that she had. Smith made a notation in Kirson's chart reading, "Out of bed to bedside commode," but testified that the notation might have been based on information received.

suable as a third party because the supervisory co-employee enjoys the employer's immunity. *See Athas,* 300 Md. at 148, 476 A.2d at 718; *Hastings,* 336 Md. at 685, 650 A.2d at 285. In the latter case we summarized the rule by saying:

"[W]e hold that a supervisory coemployee is entitled to immunity under the Act if, at the time of the accident: (1) he or she is performing a nondelegable duty of the employer; and (2) he or she performed that duty during the course of his or her employment."

*Id.* at 685, 650 A.2d at 285. This rule does not apply to Smith because she was not at the supervisory level that is within the rule and because the duty involved here is delegable.

When Smith presented this defense to the circuit court on summary judgment, one of the exhibits was a document entitled "Nursing Organization Principles—Professional Nursing Staff—Suburban Hospital." It reveals that the Department of Nursing at Suburban is headed by a Vice President for Patient Care Services who reports to the Chief Executive Officer. Accountable to the Vice President for Patient Care Services are four Administrative Directors of Nursing. Two of these administrative directors have primary responsibilities with respect to clinical services, each being responsible for specific nursing units assigned respectively to them. The third administrative director oversees development and training while the fourth is responsible for fiscal matters and informational systems. In every unit within the Department of Nursing there is a designated Patient Care Manager. The Patient Care Manager "maintains twenty-four hour accountability for the total operation of his/her particular unit (units)." These managers report to one of the Administrative Directors of Nursing for clinical services. The nursing organization principles then read: "The direct caregivers on each nursing unit are an appropriate mix of Registered Nurses, Licensed Practical Nurses, and Patient Care Technicians."

The employer's duty with which we are concerned here is that of providing reasonable medical care for Kirson's work-related accidental injury. That care had to be provided

twenty-four hours a day while Kirson was a patient at Suburban. Under the nursing organization principles the supervisor lowest on the table of organization to whom the employer can be said to have delegated that duty would be the Patient Care Manager for nursing services in the orthopedic unit. Smith was simply one of the "appropriate mix" of caregivers on a given shift. Even though Smith could delegate duties to Paul, under supervision, that is not the type of supervision or supervisory capacity that falls within the *Hastings–Athas* line of cases.

 Further, Suburban's duty, from a tort standpoint, was delegable. A nondelegable duty is a duty which the employer is " 'primarily and absolutely' obliged to perform properly." *Hastings,* 336 Md. at 676, 650 A.2d at 280. It is one as to which the employer remains liable, "regardless of the acts or omissions of the person entrusted to perform it." *Id.* at 676, 650 A.2d at 281. The nondelegable obligations and liabilities referred to in the *Hastings–Athas* rule are those that were imposed on an employer at common law. They could be the basis for an employee's negligence action against the employer, but that action was subject to the defenses of assumption of the risk, contributory negligence, and fellow servant. W.P. Keeton, *Prosser & Keeton on the Law of Torts* (5th ed. 1984) (Prosser), lists five nondelegable duties of an employer at common law. They were:

"1. The duty to provide a safe place to work.

"2. The duty to provide safe appliances, tools, and equipment for the work.

"3. The duty to give warning of dangers of which the employee might reasonably be expected to remain in ignorance.

"4. The duty to provide a sufficient number of suitable fellow servants.

"5 The duty to promulgate and enforce rules for the conduct of employees which would make the work safe."

*Id.* § 80, at 569 (footnotes omitted). Also, at common law, the rule that an employer was not liable to an employee for

injuries inflicted by the negligence of a fellow servant was subject to an exception where the negligence of the fellow servant lay in the performance or failure to perform one of the limited duties owed by the employer. Inasmuch as the employer remained liable for the breach of such a duty which had been delegated to the fellow servant (sometimes called a "vice-principal"), the duty was said to be nondelegable. *See Wood v. Abell*, 268 Md. 214, 237–39, 300 A.2d 665, 677–78 (1973); Prosser § 80, at 571–72. Thus, when the Act is superimposed on the common law, those co-employees of the compensation claimant who were charged at common law with performing the nondelegable duties of the employer ordinarily are not persons "other than the employer" and are not subject to a third-party action.

The foregoing analysis is intended only to demonstrate that the reference to nondelegable duties, and liabilities resulting from breach thereof, in the *Hastings–Athas* rule is a reference to liability for tort damages and not to an obligation imposed under the Act resulting in liability for workers' compensation.

■ Suburban's duty to furnish reasonable medical care for Kirson's work-related injury of August 6 was a delegable duty. It is imposed by the Act and did not exist at common law. Had Suburban simply paid the charges of some other health care provider to treat Kirson's work-related injury, Suburban would have no liability in tort to pay damages for malpractice in that treatment, inasmuch as Suburban could not be a tortfeasor as to the original injury, due to its employer's immunity. *Compare Morgan v. Cohen*, 309 Md. 304, 310, 523 A.2d 1003, 1005–06 (1987) (tortfeasor liable for aggravation of tortiously inflicted injury caused by negligent medical treatment). Suburban's sole liability for negligent care in the treatment of the August 6 injury was to pay compensation under the Act. See Parts III and IV, *supra.* Accordingly, because Smith was not performing a nondelegable duty, she does not partake of the employer's immunity under the *Hastings–Athas* rule. She is subject to suit in tort as a person "other than the employer."

VI

 Kirson also appeals from the JNwV that was entered in favor of Anderson and affirmed by the Court of Special Appeals. The fact-driven finding of duty and breach that supports the jury's verdict against Smith is not applicable to Anderson who was the charge nurse in the orthopedic unit at Suburban on August 13, 1993, on the shift when Kirson fell.

Kirson's expert witness from the nursing profession was Nancy Lenaghan. With respect to Anderson she testified as follows:

"Q Am I correct that you can't say, based upon the material that you reviewed that Mary Anderson did ... anything that departed from the standard of care?

"A Mary Anderson?

"Q Yes.

"A Only insofar as when there is negligence at the bedside, that responsibility passes up the chain of command and that is a pretty well recognized principle in nursing.

"Q So if anything happens by any of the RNs on the unit while Mary Anderson is the charge nurse, she is responsible, is that correct?

"A That is correct.

"Q And that is your only criticism of Mary Anderson?

"A Right."

Dr. Goral likewise testified that his only criticism of Anderson had to do with responsibility going up the nursing chain of command. This testimony does not attribute to Anderson any act or failure to act that fell below the standard of care. Rather, the testimony embraces a legal theory and assumes that, in the nursing profession, a superior is liable for tort damages for the negligence of those holding inferior positions on a table of organization. That theory is, of course, a question of law ultimately for this Court to decide.

Kirson submits that the statutes and regulations relating to the nursing profession produce that legal result. Maryland Code (1981, 2000 Repl.Vol.), §§ 8–101 through 8–802 of the

Health Occupations Article (HO) regulate the nursing profession. There is a state Board of Nursing in the Department of Health and Mental Hygiene (the Board). HO § 8–201. The Board has the exclusive power within the Department to adopt rules and regulations to determine, *inter alia:*

"(i) Individuals to whom any act of the practice of registered nursing and licensed practical nursing may be delegated; and

"(ii) The acts that may be delegated safely."

HO § 8–205(c).

In the Code of Maryland Regulations (COMAR), Title 10, "Department of Health and Mental Hygiene," Subtitle 27, "Board of Nursing," chapter 11 deals with "Delegation of Nursing Functions." COMAR § 10.27.11.03, setting forth "Criteria for Delegation," reads in relevant part as follows:

"A. The nurse may delegate the responsibility to perform a nursing task to an unlicensed individual. The delegating nurse retains the accountability for the nursing task.

"B. Nursing tasks delegated by the nurse shall:

"(1) Be within the area of responsibility of the nurse delegating the act;

"(2) Be such that, in the judgment of the nurse, it can be properly and safely performed by the unlicensed individual without jeopardizing the client welfare;

"(3) Be a task that a reasonable and prudent nurse would find is within the scope of sound nursing judgment.

"C. A nursing task delegated by the nurse may not require the unlicensed individual to exercise nursing judgment or intervention except in an emergency situation.

"D. When delegating a nursing task to an unlicensed individual the nurse shall:

"(1) Make an assessment of the patient's nursing care needs before delegating the task;

"(2) Either instruct the unlicensed person in the delegated task or verify the unlicensed person's competency to perform the nursing task;

"(3) Supervise the performance of the delegated nursing task in accordance with Regulation .04 of this chapter;

"(4) Be accountable and responsible for the delegated task;

"(5) Evaluate the performance of the delegated nursing task; and

"(6) Be responsible for assuring accurate documentation of outcomes on the nursing record."

Kirson's submission is that under § 10.27.11.03.D(4) Anderson is "responsible for the delegated task." The argument is a mere play on words.

Preliminarily, we note that Anderson did not delegate the nursing task to Paul—Smith did. More substantively, the definition section of § 10.27.11.02.B(7) defines " '[r]esponsibility' " to mean "the charge to do something." The term "responsible" is also used in § 10.27.11.03.D(6) relating to "assuring accurate documentation." These uses of the term "responsible" do not impose on a supervisor nurse, who is not personally negligent, a form of respondeat superior liability for tort damages derived from the negligence of one or more persons who report to the supervisor.

At least one purpose for the regulation's stating that the delegating nurse is "responsible for the delegated task" is to make the delegating nurse subject to possible disciplinary action by the Board because of the act or omission of the delegatee. The disciplinary provisions in the statute, however, make plain that the General Assembly never intended for the Board to impose discipline or liability without fault on registered nurses. HO § 8–316(a) lists thirty-three grounds on which the Board may impose professional discipline. These include:

"(9) Is grossly negligent in the practice of registered nursing . . .;

. . . .

"(22) Delegates nursing acts or responsibilities to an individual that the applicant or licensee knows or has reason to know lacks the ability or knowledge to perform;

. . . .

"(24) Fails to properly supervise individuals to whom nursing acts or responsibilities have been delegated[.]"

It is inconsistent with the statute as a whole to read subsection (24) as authorizing the Board, by regulation, to create respondeat superior liability on supervising registered nurses when subsection (22) requires actual negligence in the act of delegating and subsection (9) refers to gross negligence as a ground for imposing discipline. Under these circumstances the failure "properly" to supervise that is sanctionable under HO § 8–316(a)(24) means, at a minimum, a negligent failure.

For these reasons, the judgment in favor of Anderson will be affirmed.

## VII

■■■ The sole point raised by Paul's petition for certiorari is her claimed entitlement to credit against the judgment for the amount of compensation paid to Kirson. Paul is not so entitled. She was not the employer and did not pay any compensation. See LE § 9–902.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS IN FAVOR OF THE CROSS–PETITIONER AND RESPONDENT, PHYLLIS R. KIRSON, AND AGAINST THE PETITIONER AND CROSS–RESPONDENT, SUBURBAN HOSPITAL, INC., VACATED, AND CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND THAT CLAIM TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.*

*JUDGMENT OF THE COURT OF SPECIAL APPEALS IN FAVOR OF THE CROSS–RESPONDENT, MARY ANDERSON, AFFIRMED.*

*JUDGMENT OF THE COURT OF SPECIAL APPEALS IN FAVOR OF THE CROSS–RESPONDENT, MARY BETH SMITH, REVERSED. THAT CLAIM IS REMAND-*

*ED TO THE COURT OF SPECIAL APPEALS WITH IN-STRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY IN FA-VOR OF PHYLLIS R. KIRSON AGAINST MARY BETH SMITH.*

*JUDGMENT OF THE COURT OF SPECIAL APPEALS IN FAVOR OF THE RESPONDENT, PHYLLIS R. KIR-SON, AGAINST THE PETITIONER, APARANGI PAUL, AFFIRMED.*

*COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID ONE HALF BY THE CROSS–PETITIONER, PHYLLIS R. KIRSON, ONE–QUARTER BY THE CROSS RESPONDENT, MARY BETH SMITH, AND ONE QUARTER BY THE PETITIONER, APARANGI PAUL.*